**BOWMAN & BOURDON, INC. and Hamilton B. Bowman, Plaintiffs,**

v.

**Robert E. ROHR and Phyllis H. Rohr, Defendants.**

**Civ. A. No. 67–922–F.**

United States District Court
D. Massachusetts.

Feb. 24, 1969.

Richard W. Renehan, Richard S. Chute, Hill & Barlow, Boston, Mass., for plaintiffs.

Withington, Cross, Park & Groden, Philip M. Cronin, Boston, Mass., Philip S. Cronin, Plymouth, Mass., for defendants.

## OPINION

FORD, District Judge.

Plaintiffs' principal claim in this action is for rescission or damages based on defendants' alleged misrepresentations and failure to state material facts in connection with a sale of the stock of C. Drew and Company, Incorporated (Drew).

Plaintiffs are an individual and a corporation wholly owned by him and organized by him to acquire and own the stock of Drew.

Drew is a Massachusetts corporation which has for many years been engaged in the manufacture and sale of small tools. On November 1, 1964 defendant Robert E. Rohr purchased all the outstanding stock of Drew, of which he became president and a director and the active manager. His wife, Phyllis H. Rohr, as his agent, owns the real estate on which Drew's plant in Kingston is located and leases the property to Drew.

In January, 1966 plaintiff Bowman visited the Drew plant and met with Rohr to discuss the possibility of Bowman's making an investment in Drew and becoming an officer of the corporation. They met again at the Kingston plant in August, 1966. There was discussion of a proposition that Bowman should purchase a minority interest in Drew and lend Drew approximately $40,000 for working capital. Rohr showed Bowman financial statements covering the operations of the company for the year 1965 and for the six-month period ending on June 30, 1966. These statements indicated that Drew had shown an operating profit of $16,595.84 for 1965, and an operating loss of $1,020.71 for the following six-month period. Rohr told Bowman this loss had been due to difficulties encountered in connection with a government contract for crowbars, that the situation was under control, and that the company had "turned the corner" and was now operating profitably.

Bowman requested substantiation of the claim that the company was operating profitably. It was agreed that an inventory would be taken as of October 31, 1966. Rohr at his expense would provide for the counting and costing of the inventory items. Drew's regular accounting firm would be given the resulting inventory figure, would post the books and prepare financial statements for the four-month period ending October 31, 1966. Bowman was to pay the accounting firm for its services.

The inventory was taken as scheduled. Bowman was present on the first of several days spent in making the physical count, but then left. After the count was completed, the items were priced by Rohr and his clerical employees.

Items of completed products or work in process were shown on the Drew inventory at a cost figure composed of the elements of material cost, direct labor costs, and an allocation of overhead expenses. The cost elements were determined by Rohr. Material costs he calculated on the basis of steel prices and his determination, based on his experience in the business, of the amount of steel used in each tool. Labor unit costs were based on a system which Rohr had instituted of maintaining production records showing how many of a particular tool were put through a particular process by a particular worker in a week, and on Rohr's knowledge of the wage rates of each such worker.

After completion of the pricing Rohr communicated the total inventory figure to the accountants who prepared the requested financial statements. These showed an operating profit of $2,862.80 for the four-month period ending October 31, 1966. Bowman received a copy of these statements, but at this time neither he nor the accountants were given any information about the inventory other than the total figure.

Negotiations between Bowman and Rohr were resumed, and resulted in an oral agreement in December and a written contract in January under which Rohr sold all his stock in Drew to Bowman's corporation, the corporate plaintiff here. On January 26, 1967 Bowman assumed control of Drew. Bowman shortly after taking over Drew loaned $31,675 to Drew.

Under the terms of the purchase and sale agreement, the list attached to the agreement was warranted by Rohr to be a list of all the liabilities and obligations of Drew as of December 31, 1966. This list did not include certain tax obligations of Drew to the state and federal governments incurred during 1966 and totaling $4,441.64, and an invoice for steel purchased from Copperweld Steel Company in the amount of $1,731.10 which had been received by Drew in December but inadvertently misfiled. These obligations were paid by Drew after Bowman had taken over the company.

When financial statements were prepared for Drew for the fiscal year ending June 30, 1967, these statements showed an operating loss for the year of $77,000. Bowman then hired an accountant to review the financial data. In connection with this review he asked for and received for the first time the original inventory sheets of the October, 1966 inventory.

Comparison of the unit costs of items listed on the October, 1966 inventory with the unit costs shown for the same items on the June 30, 1966 inventory showed many changes in the unit material and labor costs from June to October. There were both increases and decreases in these cost figures but the net result was an increase. Goods appearing on the Kingston finished goods inventory in October showed an increase in price of $4911 over what the figure for these goods would have been using the June unit costs. Goods in process showed a similar net increase of $4700.40.

A separate listing of Starbuck tools showed an increase of $2025 between June and October. These were plumbing tools made to the specifications of a single customer. During the four-month period in question Starbuck tools were manufactured by Drew only to fill orders from this customer. Nothing was added to inventory during this period.

The accountant assumed that similar unit price changes had been made in the inventory of finished tools which Drew maintained in California, and calculated the increase as to these tools as $1563.84. He also considered as an overstatement the figure in the October inventory of $3,287.20 for handles, since while the company did have a stock of handles in June as well as October, no item for handles appears in the June inventory.

The accountant's revised financial statement as of October 30, 1966, adjusted by using for the October inventory the unit prices shown on the June inventory, indicated an operating loss for Drew for the four-month period of approximately $13,500, instead of a $2800 profit. Even if we do not accept his assumption as to the California inventory and disregard the item as to handles as arising for inadvertent failure to count handles in June, the difference arising from the changes in unit prices is still so substantial that without it the October 30, 1966 statement would have shown a loss rather than a profit.

Rohr in his testimony conceded that he had made many changes in unit prices. While he disagreed in part with the figures of Shaller, the accountant, he conceded that his increases in unit prices had added at least $3000 to the total of the October inventory and that without these increases the financial statements would have shown an operating loss for the four-month period.

Rohr testified in detail as to his reasons for each change in unit price, so far as he could remember them. Increases in unit material costs were due, he said, to increases in the price of steel purchased by Drew or to increases in the prices charged by other firms to which Drew sub-contracted the processing of certain tools. As to increases in unit labor costs, his testimony was that changes were made because the continued keeping of production records over the four-month period had provided further information as to the productivity of the workers which enabled him to determine unit labor costs more accurately. In fact, he said, as to some items, the production records showed that the earlier estimate of labor costs had been so low that tools had actually been sold at a loss.

This testimony was based entirely on Rohr's memory. There was no evidence in the form of invoices to show material costs, or of production records to show the basis for labor costs. (The production records appear to be unavailable. Rohr says he left them at the Drew plant in January, 1967. Bowman says he never found them but concedes he did destroy many old records he considered of no use and that the production records may inadvertently have been destroyed with them.)

Plaintiffs base their claim for recovery on the provisions of § 12 and § 17 of the Securities Act of 1933, 15 U.S.C. § 77l and § 77q and particularly on § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.

Section 10 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The transaction here was clearly one for the sale of securities, the stock of

Drew. The transaction also involved the use by Bowman and Rohr of communication by mail and interstate telephone, and in one instance travel by interstate transportation to a meeting in New York. The real issue is whether Rohr by his conduct has made any untrue statement of a material fact or omitted to state a material fact so as to make him liable under Rule 10b–5(2).

By August of 1966 the negotiations had reached the state where the question of whether or not Drew was operating at a profit was, as Bowman made clear to Drew, one of the essential factors which Bowman would consider in deciding whether or not to make any investment in Drew. This question of profitable operation was clearly a material fact, affecting the value of the Drew stock. So also was the size of the inventory. As was obvious to both parties, the October inventory would be a factor in the accountant's preparation of the financial statements which would confirm or disprove Rohr's statement as to profitable operation. It is also clear that Bowman was relying on Rohr to produce a correct inventory figure.

As Rohr has admitted, the changes in unit prices were substantial enough to determine whether the financial statement would show a profit or loss for the four-month period. Of course, if Rohr deliberately fixed unit costs at an inflated figure, that would constitute misrepresentation of a material fact. But even assuming that Rohr's increases in unit labor cost figures were made in good faith, based on the best information available to him, and reflected as accurately as could be done the true cost of the tools, a question still remains. The net result of these changes was to increase the total of the October inventory, and ultimately to produce on the financial statement a profit figure which did not represent a true profit on operations but merely a bookkeeping profit reflecting the change in the basis for pricing the tools in inventory. The resulting financial statements, therefore, did not reflect the true picture of the profitability of Drew's operations. In the ab-

sence of any knowledge of the changes in unit labor costs, these statements were clearly deceptive. Consequently, Rohr's failure to reveal to Bowman the fact that he had made these changes was an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

 Defendant Rohr argues that even though he did not tell Bowman anything about the unit increases and did not show him or offer him the original inventory sheets, he was under no duty to do so, and that if Bowman had wished to inquire further into how the inventory figures were calculated, he would have been given all this information. It is true that what Bowman specifically asked for was only the total inventory figure for use by the accountants, and that he relied on this without making any further investigation. In general there would be no duty on the part of Rohr to volunteer more detailed information. However, in the situation here presented, where the total inventory figure is misleading unless details as to how it was computed are revealed, the law imposes on Rohr the positive duty to disclose sufficient additional information necessary to make the figures supplied not misleading.

Similarly, it is no defense for Rohr that the financial statements revealed an increase in total inventory from $123,000 on July 1, to $163,349 on October 31. There was nothing in this to put Bowman on notice. The increase on its face would indicate that there were more tools on hand in October than there were four months earlier. Certainly there was nothing to indicate that the increase was in any degree due to manipulation of unit costs rather than to an increase in the amount of goods on hand.

The October financial statements of Drew do not show any real operating profit, but only an apparent profit due to Rohr's price adjustment. The actual result of Drew's business for the four-month period was an operating loss. Drew had been losing money before the four-month period. It has been losing

money ever since. Rohr's statement in August, 1966, that the company had turned the corner and was operating profitably was an untrue statement of a material fact.

Rohr, of course, knowingly made the changes in unit costs. While not an accountant by profession, he is a Chartered Life Underwriter, and has had training in accounting. He certainly knew that the increases he was making would eventually result in an apparent increase in operating profit on the financial statements, a profit figure which would be misleading in the absence of any knowledge of the unit price changes.

Plaintiff seeks rescission of the contract for the sale of the stock, tendering the stock to Rohr and seeking return of the $89,000 paid. Rescission is a normal remedy in such cases and is appropriate here. The alternative remedy would be to allow plaintiffs to recover in damages the difference between what they paid for the stock and the fair market value of the stock received. Drew was an old corporation. Its plant was old, its machinery in large part obsolescent. It had no sales force. It had a history of mismanagement. It was heavily in debt. Any possibility of restoring a profitable business would require the investment of a large amount of money. In the opinion of Bowman, as owner, the stock of Drew, in the absence of any showing of true profitable operations was worthless. The testimony of Friedlander, an expert witness, was that the stock had, if anything, a negative value. On this evidence the only finding could be that the stock sold by Rohr had no value, and plaintiffs could be entitled to recover the entire purchase price as damages.

Plaintiffs also seek recovery of the $31,675 loaned to Drew by Bowman. Both Rohr and Bowman were aware, during their negotiations, that Drew needed immediately a considerable sum of money for working capital. In fact they agreed that this sum would amount to at least $40,000. In December, 1966, when discussing the sale of all Rohr's stock, Bowman informed Rohr that the amount he would pay for the stock would be limited by his need to retain $30,000 of his funds for immediate investment in the corporation. It was thus clearly foreseeable that such an investment would follow plaintiff's purchase of the stock. Bowman's loan was an outlay legitimately attributable to Rohr's conduct and is recoverable. Janigan v. Taylor, 344 F.2d 781, 786.

As to the claims based on Rohr's failure to list the Copperweld invoice and various tax claims among the liabilities of Drew, plaintiffs concede that these bills were ultimately paid by Drew and in the event rescission or a rescission measure of damages is allowed, they would not be entitled to recovery of these items.

As has been stated, the real estate occupied by Drew for its Kingston plant is leased to Drew by Phyllis Rohr. The contract for the sale of the Drew stock contained a provision, paragraph 18, which provides:

"In the event any of the representations and warranties of Rohr shall prove to be incorrect in any material respect within Three (3) years of the Closing Date, the buyer shall have the right to set off any damages to which it shall be entitled to from Rohr or Phyllis Rohr against the rent payments of the company to Phyllis Rohr under the terms of the lease (Exhibit B hereto). Any controversy or claim arising out of this Section 6 of the agreement shall be settled by a court of competent jurisdiction in the Commonwealth of Massachusetts."

Since September 1, 1967, Drew, under the control of plaintiffs, has ceased to pay rent under the lease. Defendants by counterclaim, seek to recover these rent payments. The short answer to this is that any right to rent payments is enforceable against Drew, the lessee, which is not a party here, and not against plaintiffs here. Moreover, any benefit from the withholding of rent payments has accrued to Drew, which under rescission will revert to the ownership and control of Rohr.

The conclusion is that plaintiffs are entitled to rescission of the contract of

January 25, 1967, returning to Rohr the stock of C. Drew and Company, Incorporated, and recovering the price paid for said stock in the amount of $89,000, together with additional damages in the amount of $31,675.

Judgment will be entered for plaintiffs in accordance herewith. Judgment will be entered for plaintiffs dismissing the counterclaim of defendants.