20753

John W. BRADLEY, Beverly J. Bradley, John C. Gilbreth and Cheri Gilbreth, Respondents, v. Paul W. HULLANDER, Vivian Hullander, and Glen Covey Associates, Inc., of whom Paul W. Hullander and Vivian Hullander are, Appellants (two cases).

John W. BRADLEY, Beverly J. Bradley, John C. Gilbreth and Cheri Gilbreth, Respondents-Appellants, v. Paul W. HULLANDER and Vivian Hullander, Appellants-Respondents.

(249 S. E. (2d) 486)

*William R. Hare,* of *Hemphill, Hemphill & Hare,* Chester, *for appellants and appellants-respondents.*

*David A. White,* of *Roddey, Sumwalt & Carpenter,* Rock Hill, *for respondents and respondents-appellants.*

*James C. Hardin, III,* of *Roddey, Sumwalt & Carpenter,* Rock Hill, *for respondents-appellants.*

August 29, 1978.

*Per Curiam:*

The plaintiffs herein bought all of the stock of Paul's Pontiac-Buick Company, Inc. from the defendants and took charge of the corporation business. About two months later plaintiffs commenced this action [1], alleging misrepresentation as to the worth of the corporation by the defendants; a rescission of the contract and damages were asked in the prayer for relief. The action is founded upon the Uniform Securities Act, § 62-1, *et seq., Code of Laws of South Carolina* (1962) (now § 35-1-10 *et seq.* of the 1976 Code). Upon commencement of the action, the parties entered into an agreement for partial rescission of the purchase, and the defendants immediately resumed control of the business of the corporation.

The defendants in answering the complaint, interposed a defense and counter-claim, in essence alleging a right to recover damages from the plaintiffs for mismanagement of the corporation business during the two months they were in possession and control.

There are before us, for review on this appeal, three orders:

(1) Order of Judge George F. Coleman dated October 16, 1976. This order ruled upon the first cause of action in the complaint on its merits. Both plaintiffs and defendants have appealed from this order.

---

[1] The case has been to this court previously. *See Bradley v. Hullander.* 266 S. C. 188, 222 S. E. (2d) 283 (1976).

(2) Order of Judge Clyde Eltzroth dated December 29, 1976. This order refused to grant defendants' motion to declare the plaintiffs in default on the counterclaim and for judgment as relates to the counterclaim alleging mismanagement. Defendants have appealed this order.

(3) Order of Judge George F. Coleman dated May 9, 1977, which sustained the demurrer of the plaintiffs to defendants' counterclaim for mismanagement. Defendants have appealed this order.

The order in (2), refusing to declare the plaintiffs in default and refusing judgment on the counterclaim, and the order in (3), sustaining plaintiffs' demurrer to the counterclaim, are so related that they will be disposed of together after our treatment of the appeal arising from the order of Judge Coleman disposing of the issues raised in the complaint on the merits.

## THE APPEAL FROM JUDGE COLEMAN'S ORDER DATED OCTOBER 16, 1976

This order ruled that the plaintiffs were entitled to a rescission of the contract under the Uniform Securities Act. In addition, it directed that the defendants refund to the plaintiffs monies which they had paid for the stock, and pay back monies loaned to the corporation, plus interest. We are of the opinion that the order of Judge Coleman properly sets forth and disposes of all issues raised by the defendants-sellers and the plaintiffs-buyers except one, which will be discussed later. His order, with modifications, will be printed. The matters included in brackets are our own.

## ORDER OF HONORABLE GEORGE F. COLEMAN DATED OCTOBER 16, 1976

### I.

### UNDISPUTED FACTS

I find as undisputed facts the following historical background:

Under date of June 12, 1974, the Defendant Paul Hullander entered a Listing Agreement with Glen Covey Associates under which Glen Covey Associates, as broker, was given exclusive right of sale of the corporate stock of Paul's Pontiac-Buick Co., Inc., a South Carolina corporation, whose business was located at Chester, South Carolina. Glen Covey Associates, Inc. was contacted by the Plaintiffs John Bradley and J. C. Gilbreth and engaged by them to locate an automobile dealership for purchase. Covey sent to Bradley and Gilbreth a document entitled "Dealership Prospectus No. 37" containing certain information about the business of Paul's Pontiac-Buick Co., Inc. Covey put Bradley and Gilbreth in contact with Paul Hullander by giving them the telephone number of the latter and inviting them to contact Hullander. Around the first of August, 1974 John Bradley made a trip to Chester and conferred with Paul Hullander. Thereafter, on or about August 17, 1974, John Bradley and J. C. Gilbreth made a trip to Chester, as did Glen Covey. The three of them met and conferred with Paul Hullander. After some hours of discussion, Glen Covey prepared a written agreement entitled "Stock Purchase Agreement." This agreement was reviewed by Paul Hullander, John Bradley and J. C. Gilbreth and executed by them under date of August 18, 1974. At the time of entry of the agreement, Bradley and Gilbreth paid the sum of Ten Thousand and no/100 ($10,000.00) Dollars as an earnest money deposit. Paul Hullander continued in control of the business until the time of closing of the Stock Purchase Agreement,

which occurred at the office of Attorney Arthur Gaston in Chester on September 3, 1974. At that time, Bradley and Gilbreth made payment by check of the additional sum of Fifty-five Thousand Two Hundred Fifty and no/100 ($55,250.00) Dollars toward the purchase price of said stock, and they gave a note or notes in the amount of One Hundred Fifty-nine Thousand Seven Hundred Fifty and no/100 ($159,750.00) Dollars evidencing the balance of the purchase price owed, which balance was subject to adjustment. Under the agreement, the total purchase price was to be Two Hundred Thousand and no/100 ($200,000.00) Dollars, plus any increase in the net worth of the corporation occurring after May 31, 1974 and prior to take-over by the purchasers. The final amount was to be determined at some time after the take-over, and the notes were to be adjusted accordingly. The agreement, as originally drawn, contemplated the payment of an additional Ninety Thousand and no/100 ($90,000.00) Dollars at closing. However, immediately before the closing, it was agreed that the payment at closing would be Fifty-five Thousand Two Hundred Fifty and no/100 ($55,250.00) Dollars. The sum of Thirty-four Thousand Seven Hundred Fifty and no/100 ($34,750.00) Dollars was to be used in the business of Paul's Pontiac-Buick Co., Inc. until after the first of 1975, at which time it would be paid to seller. In addition to the other payments mentioned above, at the closing, Bradley and Gilbreth paid to Glen Covey Associates a fee or commission of Eleven Thousand Two Hundred Fifty and no/100 ($11,250.00) Dollars. Bradley and Gilbreth assumed control of the business immediately after closing. While in control of the business, they did advance to Paul's Pontiac-Buick Co., Inc. the sum of Thirty-four Thousand Seven Hundred Fifty and no/100 ($34,750.00) Dollars. While in control of the business, Bradley and Gilbreth caused certain expenses incurred by them to be paid by the corporation. Some time after assuming control of the business, Bradley and Gilbreth engaged the services of the firm of James E. Rhyner, Certified

Public Accountant, to perform an audit of the Balance Sheet of Paul's Pontiac-Buick Co., Inc. as of August 31, 1974. The audit was performed under the supervision of Mr. Rhyner. Much of the work was done by Floyd E. Taylor, an employee of Mr. Rhyner. The audit report of Mr. Rhyner was rendered under date of October 9, 1974. After receipt of the audit report, Bradley and Gilbreth engaged attorneys and commenced the within legal action. After commencement of the action, under date of November 9, 1974, the parties to this action entered an agreement for partial rescission of the purchase and sale transaction, and Paul Hullander immediately resumed control of the business of the corporation.

## II.

## PLAINTIFFS' FIRST CAUSE OF ACTION

After extensive pre-trial conferences, by agreement of counsel, the case came on for trial before the undersigned without a jury on the first cause of action of the Amended Complaint, which is founded on Sections 62-1 through 62-319, Code of Laws of South Carolina, 1962, commonly known as the "Uniform Securities Act." Plaintiffs rely primarily on the following language from Section 62-309 of the Code: "Any person who:

(2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission;

Is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees . . ."

## III.

### PLAINTIFFS' SPECIFICATIONS

The specific untrue statements or omissions sought to be proved by Plaintiffs are as set forth in a set of specifications entitled "Stipulation" dated April 10, 1975 and an addendum thereto entitled "Addendum to Stipulation" dated May 29, 1976. Together, these set forth nineteen (19) specifications. By agreement of counsel, these specifications are treated as a part of Paragraph 12 of the First Cause of Action of the Amended Complaint.

No proofs were developed at trial with reference to specifications numbered 8, 11, 14 or the following items under No. 15(a)(6), (b)(1), (4), (5) or (6). The court therefore gives no consideration to these specifications.

Specifications 1, 2, 3, 12, 13, 15 and 19 deal with the accuracy of the Balance Sheet at Page 1 of the Operating Report of the corporation for the period ending May 31, 1974. Plaintiffs contend that Defendants represented as to said balance sheet: (1) That it accurately set forth the financial condition of the corporation; (2) That it accurately set forth the results of operation from January 1 through May 31, 1974; (3) That it was prepared in conformity with generally accepted accounting principles consistently applied; (12) That ninety (90%) per cent of the accounts receivable of the corporation shown thereon were less than sixty (60) days old; and (15) That each asset and liability account shown thereon was substantially correct.

Plaintiffs further contend (19) that the Defendant Paul Hullander failed to advise Plaintiffs of changes and inconsistencies in accounting methods reflected on the Operating Report of May 31, 1974 as compared to methods previously followed.

Specifications 4, 5, 6, 7, 9 and 10 deal with representations made by Defendants as to the operation of the business of the corporation after May 31, 1974. Plaintiffs contend that

Defendants represented that between May 31, 1974 and August 18, 1974—(4) There has been no change in the financial condition or business of the corporation which has been materially adverse; (5) The corporation has incurred no obligations or liabilities or made any commitments other than in the usual and ordinary course of business; (9) The corporation is not in default under any agreement to which it is a party or in the payment of any of its obligations; and, (10) The corporation had good and marketable title to all of its property and assets, except property and assets disposed of since May 31, 1974 in the usual and ordinary course of business. Plaintiffs further contend that Defendant represented that between May 31 and the date of take-over—(6) The corporation will not have made any commitments or disbursements or incurred any obligations or liabilities of a substantial nature not in the usual and ordinary course of business; and (7) The corporation will not have sold or transferred any assets except in the usual and ordinary course of business.

Specifications 16, 17 and 18 deal with alleged misstatements or omissions in connection with the prospectus. Plaintiffs contend that Paul Hullander orally respresented to Glen Covey (16) That the corporation "has been making Seventy Thousand and no/100 ($70,000.00) Dollars profits before tax regularly plus paying him salary and bonus of $75,000.00 —$100,000.00 annually"; and (17) that an accounting procedure on some corporate leased vehicles resulted in an understatement of the net worth of the corporation. Plaintiffs further contend (18) that Paul Hullander, knowing of such misstatements, omitted to advise Plaintiffs of their incorrectness and misleading nature.

## IV.

## STATEMENTS CONTAINED IN THE WRITTEN AGREEMENT

Certain statements were contained in the written agreement entered between the parties. Specifications 1, 2, and 3, derive from the following provisions of the agreement of August 8, 1974, at pages 1 and 2:

"Seller represents and warrants to Buyer that:

(c) Seller has furnished to buyer copies of financial statements of the corporation, together with related statements of income and expense, as set forth in attachment 'A' hereto. Said financial statements accurately set forth the financial condition of the corporation as of each said date, and of the results of operation for the period represented, prepared in conformity with generally accepted accounting principles consistently applied."

Two signed copies of the August 18, 1974 Stock Purchase Agreement were introduced into evidence. One copy of the Agreement entered in evidence (P-17) contains the following notation in longhand on Attachment "A": "Pontiac Motor Division Financial Statement." Another copy of said agreement introduced into evidence (D-5) contains the following handwritten notation on attachment "A": "Pontiac Motor Division Financial Statements." (Emphasis added).

Both John Bradley and J. C. Gilbreth testified that the only Pontiac Motor Division Financial Statement displayed to them prior to entry of the contract was the first page of the May 31, 1974 Balance Sheet. Attachment "A" to Exhibit P-17 was filled out in the handwriting of J. C. Gilbreth, who testified that the reference was intended to be only to the balance sheet attached to the agreement as Attachment "C". The notation on Attachment "A" on the Exhibit D-5 was in the handwriting of the witness Glen Covey, who testified that the only Financial Statement intended to be referred to in the agreement or in Attachment "A" was the Financial

Statement attached to the agreement as Attachment "C". Defendants offered no testimony or other evidence to indicate that any financial statements other than the Balance Sheet attached to the agreement as Attachment "C" were intended to be referred to by the language of the aforesaid provisions of subparagraph (c) from pages 1 and 2 of the Agreement.

Regardless of whether other financial statements were involved, it is undisputed that the parties did intend the language of subparagraph (c) to refer to the May 31, 1974 Balance Sheet that was Attachment "C" to the agreement. Thus, the provisions of said subparagraph (c) constitute statements concerning the Balance Sheet of the corporation for the period ending May 31, 1974. I therefore find that Defendants made statements as alleged by Plaintiffs in Specifications 1, 2, and 3.

The writen agreement of August 18, 1974 also contained express representations and warranties in relevant part as follows:

(d) The corporation has good and marketable title to all of its property and assets (except property and assets disposed of since such date in the usual and ordinary course of business), subject to no mortgage, pledge, lien or other encumbrance except as disclosed in the financial statement of the company of May 31, 1974, or in Attachment "B" annexed hereto and made a part hereof.

(e) As of May 31, 1974, the corporation has no obligations, liabilities or commitments, contingent or otherwise, of a material nature which were not provided for, except as set forth in such financial statement or in Attachment "B".

I further find that the foregoing provisions of subparagraphs (d) and (e) of the agreement constitute statements relating to the Balance Sheet of the corporation for the period ending May 31, 1974 and to the condition of the corporation as of said date.

All of the foregoing statements relate to the condition of the corporation at May 31, 1974. In addition, the agreement contained representations regarding the period after May 31, 1974, in relevant part, as follows:

(f) Since the date of the corporation financial statement of May 31, 1974, there has been no change in the nature of the business of the corporation, nor in its financial condition or property, other than changes in the usual and ordinary course of business, none of which has been materially adverse, and the corporation has incurred no obligations or liabilities or made any commitments other than the usual and ordinary course of business or as disclosed in Attachment "B".

(i) The corporation is not in default under any agreement to which it is a party nor in payment of any of its obligations. (j) Between the date of the financial statement of May 31, 1974 and date of take-over, the corporation will not have . . . (iii) made any commitments or disbursements or incurred any obligations or liabilities of a substantial nature and which are not in the usual and ordinary course of business, or (iv) mortgaged or pledged or subjected to any lien, charge or other encumbrance any of its assets, tangible or intangible, or (v) sold, leased, or transferred or contracted to sell, lease or transfer any assets, tangible or intangible, or entered into any other transactions, except in the usual and ordinary course of business, except as indicated on Attachment "B" . . .

Attachment "B" to said agreement was entitled "LIST OF ITEMS AS REQUIRED UNDER PARAGRAPHS 1(d), 1(e), 1(f), 1(g), 1(h) OF STOCK PURCHASE AGREEMENT." There were no such items listed on Attachment "B". Attachment "B" was signed by John C. Gilbreth, Paul W. Hullander, and John Bradley.

I find that the foregoing provisions of the agreement of August 18, 1974 constitute statements as alleged by Plaintiffs in their specifications as follows:

| Specification Number | Representation in Agreement |
|---|---|
| 4 | (f) |
| 5 | (f) |
| 9 | (i) |
| 10 | (d) |
| 6 | (j) (iii) |
| 7 | (j) (v) |

I further find that said statements were made by Defendants to Plaintiffs in connection with the sale of the corporate stock of Paul's Pontiac-Buick Co., Inc. to Plaintiff.

## V.

### STATEMENTS IN THE PROSPECTUS

In addition to the foregoing statements contained in the Stock Purchase Agreement of August 18, 1974, Plaintiffs also rely upon the following statements contained in the dealer prospectus prepared by Glen Covey Associates:

Under the Section entitled *"PROFIT—EXPENSES—GROSSES—SALES RECAP"*. "I do not have the information to complete this section as yet. Dealer reports that the deal has been making $70,000.00 profits before tax regularly plus paying him salary and bonus of $75,000.00 — $100,000.00 annually."

Under the Section entitled *"SALE INFORMATION"*; ASSETS TO BE SOLD: Corporate stock ($47,000.00 cash in bank through May, 1974 with virtually no trade creditors).

"SALE PRICE:" $200,000.00 (Approximately $25,000 over net worth)

"OTHER INFORMATION:" This is the cleanest looking corporate purchase that I have seen. An accounting

procedure on some corporate lease vehicles could have the net worth of the corporation understated. This appears to be the only area where a close look see would be required, assuming the normal corporate purchase indemnifications hold harmless clauses, guarantees, etc. are obtained in the purchase (which appears to be no problem in this deal).

I find that the prospectus was prepared and forwarded to Plaintiffs by Glen Covey Associates, Inc. in the course of Covey's engagement by Defendants as a broker to sell the stock of Paul's Pontiac-Buick Co., Inc. and that the prospectus contained the statements quoted above. However, the testimony is in conflict as to whether Paul Hullander had actual notice of the contents of the prospectus and as to whether he specifically informed Plaintiffs of the incorrectness of the statements regarding earnings of the corporation and salary of the owner.

## VI.

## INTERPRETATION OF THE
## STATUTE—IN GENERAL

Section 62-309(2) of the Code was taken almost verbatim from Section 12(2) of the Securities Act of 1933, 15 U.S.C.A. Section 771(2). See Official Code Comment to Section 410 of the Uniform Securities Act [Section 62-309]. Accordingly, cases interpreting Section 12(2) of the Securities Act of 1933, while not binding authority on this Court, are looked to for guidance in interpreting the corresponding South Carolina Code provision with which we are dealing.

The elements of recovery under Section 12(2) were aptly summarized in the recent case of *Aronson v. TPO, Inc.,* 410 F. Supp. 1375 [S.D.N.Y., 1976] CCH *Fed. Sec. L. Rep.,* Par. 95, 486, as follows:

To recover under Section 12(2) plaintiffs must show that defendants misstated or omitted to state certain material facts, that such misstatements or omissions rendered the state-

ments made misleading, and that plaintiffs did not know the truth. *Hill York Corp. v. American International Franchises, Inc.,* 448 F. (2d) 680, 696 & n. 25 (5th Cir. 1971); *Johns Hopkins University v. Hutton,* 422 F. (2d) 1124, 1128-29 (4th Cir. 1970), *cert. denied,* 416 U. S. 916, 94 S. Ct. 1622, 40 L. Ed. (2d) 118 (1974); 15 U. S. C. Section 771. A "material" omission of fact is a fact about which "an average prudent investor ought reasonably to be informed before purchasing the security". *SEC v. Shapiro,* 494 F. (2d) 1301, 1305 (2d Cir. 1974); *Hill York Corp., supra; Demarco v. Edens,* 390 F. (2d) 836, 840 (2d) Cir. 1968). Section 12(2) does not require that plaintiffs show reliance, causation or that the sale would not have occurred absent the omission. *Hill York Corp., supra; Demarco,* 390 F. (2d) at 841. Plaintiffs' sophistication in the securities industry and the availability of the information to plaintiffs through sources other than defendants are immaterial to defendants' obligations under this section. *See, e.g., Hill York Corp., supra.*

Further, "the [plaintiffs] do not have to prove that they could not have discovered the falsity upon reasonable investigation." *Gilbert v. Nixon,* 429 F. (2d) 348, 356 (10 Cir. 1970).

It appears clear that a seller may violate Section 12(2) by mere negligent representations or omissions, 3 L. Loss, *Securities Regulation,* ch. 11 C, p. 1705 (1961). Moreover, the entire burden of proof with regard to the existence or nonexistence of seller negligence, recklessness or intent to defraud has been shifted by Section 12(2) to the seller. According to the United States Supreme Court in *Wilko v. Swan,* 346 U. S. 427, 431, 74 S. Ct. 182, 184, 98 L. Ed. 168, 173 (1953):

[Section] 12(2) created a special right to recover from misrepresentation which differs substantially from the common-law action in that the seller is made to assume the burden of proving lack of *scienter.* See also *Woodward v. Wright,* 266 F. (2d) 108 (10th Cir. 1959).

The Federal Courts have imposed Section 12(2) liability in corporate acquisitions where the sellers have engaged in misrepresentations or omissions with regard to corporate earnings, capital requirements, accounting methods and financial statements. *Aronson v. TPO, Inc., supra; The Value Line Fund, Inc. v. Marcus* (D.C.N.Y. 1965) '64-'66 CCH Dec. Par. 91,523; *Bowman & Bourdon, Inc. v. Rohr,* 296 F. Supp. 847 (D. Mass. 1969), *affd.* 417 F. (2d) 780 (1st Cir. 1969) and cases cited therein.

## VII.

### CERTAIN STATEMENTS OF MATERIAL FACTS

The statements found above to have been made by Defendants must be analyzed in terms of the provisions of the applicable sections of the Uniform Securities Act and judicial interpretations of the language of those provisions. I am of the opinion, and I so find and conclude, that the aforesaid statements made in writing as representations and warranties hereinabove set out in Section IV of this Order in the written agreement of August 18, 1974 clearly meet the test of materiality.

As to the statements made concerning the May 31, 1974 Balance Sheet, it is undisputed that it was referred to in the negotiations preceding the entry of the agreement, was many times expressly referred to in the provisions of said agreement, and of course, was actually made a part of the agreement, as Attachment "C" thereto. Certainly, an average prudent investor ought reasonably to be informed concerning the assets and liabilities of a corporation before purchasing the stock of that corporation, especially when he is purchasing substantially all of the outstanding stock. While the Defendant Paul Hullander testified that he informed the Plaintiffs of mistakes in the May 31, 1974 Balance Sheet, even Mr. Hullander did not claim that the statements concerning same were immaterial. Similarly, all of the other written

statements specified by Plaintiffs and found above to have been made by Defendants were matters as to which an average prudent investor ought reasonably to be informed before purchasing.

I further conclude that materiality does not require a showing of reliance, causation or that the sale would not have occurred absent the misstatement or omission. *Hill York Corp., supra; Demarco v. Edens,* 390 F. (2d) 836 at 841 (2nd Cir. 1968). The standard for determining materiality is an entirely objective one, and the actual attitude of the parties toward the matter is not determinative. *SEC v. Texas Gulf Sulphur Co.,* 401 F. (2d) 833, 849 (2nd Cir. 1968), citing *Kohler v. Kohler,* 319 F. (2d) 634, 642, 7 A. L. R. (3d) 486 (7th Cir. 1963), and *List v. Fashion Park,* 340 F. (2d) 457 at 462 (2 Cir. 1965).

I therefore further conclude that, on the issue of materiality, it is not necessary for the Court to consider certain testimony of the Defendant Paul Hullander regarding the extent to which the parties understood or relied upon said statements, which testimony was objected to by Plaintiffs and received in the record, with a reservation of a final ruling on Plaintiff's objections.

For the foregoing reasons, I further conclude that the aforesaid written statements were material.

There appears to be no issue as to whether the statements in questions were statements of facts, and I hereby conclude that such statements were statements of material facts.

## VIII.

### OFFER OR SALE OF SECURITY BY MEANS OF THE STATEMENTS

Section 62-309 imposes liability upon "any person who offers or sells a security by means of any untrue statement . . ." Section 62-18(3) provides ". . . an offer to sell or to buy is made in this State, whether or not either party is then present in this State, when the offer (a) originates from this State . . ." Subsection 4 provides "an offer to buy or to sell is accepted in this State when the acceptance (a) is communicated to the offeror in this State . . ." Section 62-2(10)(a) provides " 'sale' or 'offer to sell' includes every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value." Subsection (b) provides " 'offer' or 'offer to sell' includes every attempt or offer to dispose of, or solicitation of and offers to buy, a security or interest in a security for value." Subsection (12) provides " 'security' means any . . . stock, . . ., transferable shares, . . . or, in general, any interest or instrument commonly known as a 'security'." In general, a "sale" or "offer to sell" is regarded to include any transaction by which stock is offered to individuals or to the general public. 69 Am. Jur. (2d), Securities Regulation— State, Section 29.

In view of the foregoing authorities, I hereby conclude that the Defendants fall within the language "one who offers or sells a security." Likewise, it is clear that the offer and sale were made "by means of" such statements.

## IX.

## UNTRUTH OF CERTAIN STATEMENTS

Having found that Defendants offered and sold securities by means of the specified written statements of material facts, we come to the question of whether any of said statements were untrue. As to the Balance Sheet for the period ending May 31, 1974, the questions presented are: (1) Did it accurately set forth the financial condition of the corporation; (2) Did it accurately set forth the results of operation from January 1 through May 31, 1974; and (3) Was it prepared in conformity with generally accepted accounting principles consistently applied?

The issues as to the accuracy of the Balance Sheet for May 31, 1974, as developed at trial, related primarily to certain particular accounts. For the sake of simplicity, the Court will first consider only the following:

| Account No. | Assets | Amount |
|---|---|---|
| 202 | Cash in Bank | $ 46,165.00 |
| 210 | Receivables-customer notes-not due | 13,573.00 |
| 220 | Receivables-customer accounts-not due | 24,025.00 |
| 274 | Pre-paid interest | 26,098.00 |
| 277 | Lease and Rental Units | 227,223.00 |
| 280 | Land | 34,580.00 |

| Account No. | Liabilities | Amount |
|---|---|---|
| 220 | Accounts receivable credit balances | |
| 360 | Capital Stock | $90,000.00 |

Before proceeding to a consideration of proofs respecting the above accounts, it should be noted that the full audit performed by Plaintiffs' expert accounting witnesses was made for the period ending August 31, 1974. In order to evaluate various accounts on the Balance Sheet for May 31, 1974, it

was necessary, in some instances, for the witnesses and the court to relate the August 31st audit findings back to the May 31st Balance Sheet. This rendered the proofs at trial and the findings of the court very difficult.

      [Here the trial judge, in a well-reasoned, detailed ■ statement covering 20 pages, discusses each of the eight accounts enumerated above. In the interest of brevity, we refrain from printing the same. It is sufficient to say that he found that numerous statements in the balance sheet were untrue, rendering untrue the defendants' statements that the balance sheet of May 31, 1974 accurately set forth the financial condition of the corporation, and rendering untrue the statement that the balance sheet was prepared in conformity with generally accepted accounting principles. The findings of fact are abundantly supported by the record and we are not convinced that they should be disturbed.]

## X.

## SALES OUT OF TRUST

In addition to misstatements contained on the Balance Sheet for May 31, 1974, Plaintiffs contended that Defendants made certain additional misrepresentations as set forth in Plaintiff's specifications numbers 4, 5, 6, 7, 9, and 10. These are discussed in Section III above. The principal proofs offered in support of these specifications were in respect to certain transactions referred to at trial as "Sales out of Trust." The evidence as to these matters may be summarized as follows:

      [Here the trial judge, in a five-page statement, dis- ■ cusses that which took place within the corporate business between May 31, 1974 (the date of the balance sheet) and September 3 (the date of the sale). In the interest of brevity, we refrain from printing the same. It is sufficient to say that we agree with his findings of fact and conclusions. He found that sales out of trusts occurring after May 31, 1974, were changes in the corporation's financial

condition or property other than changes in the usual and ordinary course of business, rendering untrue the sellers' written representation and warranty.]

## XI.
## BUYERS' KNOWLEDGE

As to the issue of whether the Plaintiff-Buyers had ■ knowledge of the misstatements and omissions, the evidence may be summarized as follows:

[Here the judge discusses the testimony of the two buyers and of seller Paul Hullander, covering approximately 12 pages. In the interest of brevity, we refrain from printing the same. In general the testimony of the plaintiffs was that they were not aware of the untruth of any of the statements contained in the written agreement. He analyzed the testimony of Mr. Hullander contra, and concluded:

"Even if all of the testimony of Mr. Hullander is admitted and accepted as true, there are substantial untruths as to which there is no evidence of plaintiffs' knowledge."

The evidence on several points is susceptible of more than one reasonable inference. The judge concluded, and we agree, that the plaintiff-buyers did not have knowledge of important misstatements and omissions. He said:

"Moreover, the very general testimony by defendants [Hullander] is insufficient to refute the strong inference of reliance arising from defendants' conduct in giving the written warranty."]

## XII.
## ADMISSIBILITY OF DEFENDANT'S TESTIMONY

Even if this Court were persuaded that the Defendant ■ made representations which were sufficiently specific to supply the Plaintiffs with full and complete knowledge as to the true financial condition of the corporation, the parol evidence rule serves to bar the introduction of the statements by the Defendant.

In reaching this determination, the Court was called upon to decide whether the parol evidence rule applies to the situation where a seller who has given written warranties seeks to introduce oral statements made by himself in order to show that the Buyer had knowledge of the falsity of the written warranties.

In an action for damages for breach of a written warranty, South Carolina Courts have long refused to allow the Seller to escape liability because the Buyer knew of the falsity of the written warranty:

Both parties were aware of the unsoundness at the time of the contract, but both perhaps ignorant of the extent of the injury. Hence the cause and the necessity of the warranty to indemnify the purchaser against the possible and even probable result, that it might become, as it actually has, permanent and incurable. It was a matter of contract on the part of the Defendant, and whether the Plaintiff knew of the unsoundness or not, was immaterial; the Defendant is bound to perform his contract. *Wallis v. Frazier,* 2 Nott & McC. 516, 517 (1820).

See also, *Kimbrell v. Taylor,* 135 S. C. 321, 133 S. E. 829, at 830:

The appellant argues, with considerable force, that the purchasers of the stock had superior knowledge to her as to the value of the stock, since she was not acquainted with the business of the corporation. The testimony bears out her claim in this respect. But since the appellant signed the written agreement, and it appearing that her execution of that paper was done fairly, freely, and honestly, she is, of course, bound by its terms.

Also, South Carolina has long recognized the right of a buyer to sue for rescission for breach of warranty. *Yancey v. Southern Wholesale Lumber Co.,* 133 S. C. 369, 131 S. E. 32, 35 (1925):

If all that the Defendants have alleged and endeavored to prove with reference to the quality and adaptability of the

machinery had been true, the Defendant would have had either of two remedies, as expressed in the case of *Ebner v. Haverty Co.,* 128 S. C. 151, 122 S. E. 578: "(1) He (the buyer) may, upon discovery of the misrepresentation, within a reasonable time which the law allows for an inspection, return or offer to return the property, and demand a rescission of the contract and a return of the purchase price paid by him; or (2) he may retain the property, and demand damages for a breach of the contract."

When a written agreement containing a warranty has been entered, the Buyer may not show an additional oral warranty. *Sanders v. Allis Chalmers Co.,* 237 S. C. 133, 115 S. E. (2d) 793 (1960):

We are of opinion that the warranty runs to the purchaser; that oral representations, if any, which may have been made at the time of sale were superseded by the contract in writing and, therefore, inadmissable for the purpose of varying the terms of the written agreement;

It can be seen from the foregoing authorities that in an action for breach of warranty, whether for damages or for rescission, the existence of the written warranty fully satisfied the Buyer's burden to show reliance. When the Buyer was proceeding on a written warranty, the courts made short work of the warrantor's claims that the Buyer knew the warranty was false.

For a learned discussion of the general subject matter with which the Court is concerned, see *J. S. Strahorn, Jr.,* "The Parol Evidence Rule and Warranties of Goods Sold," 19 Minn. L. Rev. 726. Of particular interest is the Section of the Article entitled "Extrinsic Evidence to Eliminate Warranties Which Result From the Writing Itself", found at pages 749 and 750 of the Article:

Certain warranties are said to be expressed in a writing whenever the parties see fit to write out the statements which serve as operative facts to create . . . liability. * * * To

what extent can any of these warranties be deprived of effect by extrinsic evidence of facts not themselves incorporated into the writing? Examples are: . . . any express agreement, disclaimer, waiver or similar activity of the buyer limiting a warranty which would otherwise exist.

The few cases which have dealt with the problem exclude . . . specific activity, usually a statement, particularly limiting the warranty which would otherwise follow.

Authority for the above statement is cited at footnote 57 as follows:

* * * The following cases hold that it cannot be shown by parol that the buyer was aware of a defect allegedly warranted against: *Watson v. Roods* [*Roode*], (1890) 30 Neb. 264, 46 N. W. 491, and *Hogan's Exr. v. Carland* and *Rutledge,* (1833) 5 Yerg. (Tenn.) 283. Some cases involving the sale of land likewise suggest useful analogies: *Miller v. Desverges,* (1885) 75 Ga. 407; *Harlow v. Thomas,* (1833) 15 Pick. (Mass.) 66; *LaFrance v. Kashishian,* (1928) 204 Cal. 643, 269 Pac. 655.

There is, of course, a well established exception to the parol evidence rule which allows extrinsic evidence by the party attacking an instrument on the ground of fraud. *Allen-Parker Co. v. Lollis,* 257 S. C. 266, 185 S. E. (2d) 739 (1971). This exception has been invoked by Federal Courts to allow Plaintiffs suing under Section 10(b) of the Securities Exchange Act of 1934 to assert oral misrepresentations outside of a written contract. *Allen Organ Co. v. North American Rockwell Corp.,* 363 F. Supp. 1117 (E. D. Pa. 1973); *Vanderboom v. Sexton,* 460 F. (2d) 362 (8th Cir. 1972); *Kardon v. National Gypsum Co.,* 83 F. Supp. 613 (E.D. Pa.1947).

Defendants assert that extrinsic evidence is allowable both to prove and disprove fraud, citing 37 C.J.S. *Fraud* § 104, p. 410. The citation does not support the proposition, but on the contrary contains the following passage:

As discussed in Evidence, § 979, the fact that the transaction effected by fraud is evidenced by writing does not prevent the introduction of parol evidence as to fraud, *the attack of a written instrument for fraud being a well recognized exception to the general rule prohibiting the introduction of parol evidence.* (Emphasis Added)

In the instant case, Defendants attack the written instrument, but not on the ground of fraud. Nothing has been alleged or proved to indicate that any act of deceit, fraud or even innocent misrepresentation was made by others to induce the Defendants to enter the agreement containing the written warranties. Hence, the exception plainly does not apply.

It can be seen from the foregoing that parol evidence is generally admissible to show fraud in the inducement of a writing but not to show warranties or representations extrinsic to the writing. Addressing this seeming inconsistency, Professor Wigmore has offered the following explanation:

The explanation seems to be that the vital additional element in fraud is the party's state of mind, which neither can be nor is intended to be embodied in the written document, and that hence the rule does not forbid considering it wherever it is the vital element of the claim. In other words, in an action of *deceit,* or in a proceeding of *rescission of contract* wherever this by the law depends upon the promissor's conscious falsity, the present rule interposes no obstacle; although in an action of contract upon an alleged warranty as a part of it, or in a proceeding of rescission for breach of warranty or innocent misrepresentation, the same representations could not be considered. IX Wigmore, *Evidence,* Section 2439, p. 125 (3rd Ed. 1940).

From authorities quoted above, it has been seen that an action under the Uniform Securities Act, like an action at common law or equity for rescission based

upon breach of warranty or innocent misrepresentation, does not depend upon a showing of the Seller's conscious falsity. There being no issue as to the Seller's conscious falsity, there is no need for resort to parol evidence.

In regard to the parol evidence issue, the Court must also consider the terms of the written agreement entered under date of March 18, 1974 and of evidence in the record. The agreement contained an integration clause as follows: "This agreement contains all of the terms agreed upon between the parties with respect to the subject hereof." The parol evidence rule is particularly applicable when the written agreement contains a recital of this nature. 30 Am. Jur. (2d) 155, *Evidence,* Section 1019.

Finally, the Court is of the opinion that even if not barred by the parol evidence rule, as such, Defendants are estopped to assert the untruth of their own misrepresentations. The point is generally stated in 32A C.J.S. Evidence § 979, at Page 475, as follows:

*Introduction of evidence if fraud by wrongdoer.* Only the victim of fraud can be permitted to show such fraud by extrinsic evidence; one is estopped to show his own fraud to impeach a writing which is sought to be used against him.

For all of the reasons set forth above, I conclude and hold that the testimony of the Defendant Paul Hullander given to prove that the Plaintiffs had knowledge of the untruth of written representations and warranties made by Defendants in the Agreement of August 18, 1974 is inadmissible under the parol evidence rule and the doctrine of estoppel. It follows, and I so hold, that the only admissible evidence as to Plaintiffs' knowledge of said untruths is the testimony of the Plaintiffs that they did not know of such untruth.

## XIII.

## DEFENSE OF DUE DILIGENCE

Having concluded that the testimony of the Defendant Hullander purporting to show Plaintiffs' knowledge of the untruths and omissions was insufficient to that purpose and, in any case, was inadmissible, I proceed to the question of whether, in the language of the statute, the Defendants sustained "the burden of proof that (they) did not know, and in the exercise of reasonable care could not have known of, the untruth or omission . . ."

The showing of untruths and omissions referred to above, clearly shifted the burden to Defendants to show that they did not know and, in the exercise of reasonable care, could not have known of the untruths or omissions. Considering the record as a whole, I conclude that Defendants have manifestly failed to carry this burden of proof. Although not schooled in accounting, the Defendant Paul Hullander had general charge of the dealership, and the bookkeepers worked under his supervision. His testimony purporting to show that he told Plaintiffs of the untruths and omissions, while not admissible on the issue of Plaintiff's knowledge, strongly indicates that Mr. Hullander had knowledge of the untruth of matters warranted in the agreement. Moreover, under fundamental principles of South Carolina law, a master is liable for and is charged with knowledge of the acts and conduct of his servants operating within the scope of their employment. See cases collected at West South Carolina Digest, *Master and Servant*, Sections 303-305 and *Principal and Agent*, Sections 177 *et seq*. See also, 3 Am. Jur. (2d) *Agency*, Sections 273 *et seq*.

In addition to the above finding that the knowledge of the servants was imputable to Mr. Hullander, I further find that Defendants have failed to sustain the burden of showing that they could not, in the exercise of reasonable care, have known of at least certain of the

untruths or omissions that were contained in the representations and warranties made by the Defendants in the written agreement of August 18, 1974.

## XIV.

## CONCLUSION AS TO LIABILITY

Based upon all of the foregoing, I conclude and hold that Defendants are liable to Plaintiffs upon Plaintiffs' First Cause of Action, and that Plaintiffs may recover thereunder in accordance with the provisions of Section 62-309, Code of Laws of South Carolina, 1962, the measure and extent of such recovery to be as hereinafter set forth. The findings herein are made with respect to the First Cause of Action only and do not ascribe to Defendants any actual fraud or scienter.

## XV.

## MEASURE OF RECOVERY

Having concluded that the Plaintiffs have established their case for the statutory remedies, the Court turns to the question of the recovery to which Plaintiffs are entitled. It is undisputed that Plaintiffs paid to Defendants on August 18, 1974 the sum of Ten Thousand and no/100 ($10,000.00) Dollars and, at closing of the purchase and sales transaction on September 3, 1974, the sum of Fifty-five Thousand Two Hundred Fifty and no/100 ($55,250.00) Dollars. Plaintiffs are entitled to recover these sums, together with interest.

As part of the same overall stock purchase and sale transaction, shortly after taking over the business, Plaintiffs lent to Paul's Pontiac-Buick Co., Inc. the sum of Thirty-four Thousand Seven Hundred Fifty and no/100 ($34,750.00) Dollars. Since the transaction was subsequently rescinded by agreement and the stock of the corporation reconveyed entirely to the Defendants, Plaintiffs' loan to the corporation is a proper element of rescis-

sionary damages to be recovered in this action, with interest. For authority squarely on point, see *Bowman & Bourdon, Inc. v. Rohr,* 296 F. Supp. 847, 852 (D. Mass. 1969), *aff'd.,* 417 F. (2d) 780 (1st Cir. 1969):

Plaintiffs also seek recovery of the $31,675 loaned to Drew [the corporation] by Bowman. Both Rohr and Bowman were aware, during their negotiations, that Drew needed immediately a considerable sum of money for working capital. In fact they agreed that this sum would amount to at least $40,000. In December, 1966, when discussing the sale of all Rohr's stock, Bowman informed Rohr that the amount he would pay for the stock would be limited by his need to retain $30,000 of his funds for immediate investment in the corporation. It was thus clearly foreseeable that such an investment would follow plaintiff's purchase of stock. Bowman's loan was an outlay legitimately attributable to Rohr's conduct and is recoverable. *Janigan v. Taylor,* 1 Cir., 344 F. (2d) 781, 786.

Defendants have asserted a right to recover from Plaintiffs rent owing by the Corporation to the Defendants for the period during which Plaintiffs were in control of the Corporation. This question, too, was considered in the case of *Bowman & Bourdon v. Rohr, supra,* at page 852:

Since September 1, 1967, Drew [the corporation], under the control of plaintiffs, has ceased to pay rent under the lease. Defendants by counterclaim seek to recover these rent payments. The short answer to this is that any right to rent payments is enforceable against Drew, the lessee, which is not a party here, and not against plaintiffs here. Moreover, any benefit from the withholding of rent payments has accrued to Drew, which under rescission will revert to the ownership and control of Rohr.

As in *Bowman,* the Corporation is not a party to the suit, is liable for rent that may be owed, and any benefit from nonpayment of rent will accure to the Corporation. By virtue of the agreement of November 9, 1974,

the Corporation reverted to the ownership and control of Defendants. I therefore find and hold that the Defendants are not entitled to an offset for the rent in question.

Plaintiffs also seek to recover aganist the Defendants the sum of Eleven Thousand Two Hundred Fifty and no/100 ($11,250.00) Dollars, representing the amount of the fee or commission paid by Plaintiffs to Glen Covey Associates in connection with the transaction. Plaintiffs' claim for recovery of this amount is based upon the proposition that the commission paid to the broker is "consideration paid for the security," in the language of the statute. I have fully considered Plaintiffs' contentions and authorities cited by them in respect to this matter. However, I conclude and hold that said commission is not a proper element to be recovered by Plaintiffs under their First Cause of Action, and it is therefore denied.

By their Tenth Defense and Setoff, Defendants alleged entitlement to credit for certain expenses paid by the Corporation to or on behalf of Plaintiffs. At trial, a Stipulation was entered by the parties as to certain particular items that were paid by the Corporation for or on behalf of Plaintiffs. There was no dispute as to the amounts. After full consideration of the evidence, I find and hold that the following items paid by the Corporation were not business related expenses:

*Paid To Or On Behalf Of John Bradley:*

| | |
|---|---:|
| Insurance on car | $ 258.00 |
| Downpayment on car | 590.71 |
| Moving and Travel Expense | 3,904.07 |

*Paid To Or On Behalf Of J. C. Gilbreth:*

| | |
|---|---:|
| Travel Expense | 592.40 |

*Paid On Behalf Of Bradley And Gilbreth:*

| | |
|---|---:|
| Chester Motor Lodge | 368.16 |

| | |
|---|---:|
| TOTAL | $5,713.34 |

I further find and hold that the aforesaid amount of Five Thousand Seven Hundred Thirteen and 34/100 ($5,713.34) Dollars should be credited to Defendants in reduction of the amount of the loan of Thirty-four Thousand Seven Hundred Fifty and no/100 ($34,750.00) Dollars made by Plaintiffs to the Corporation. Although the exact dates of said loan and of the said credit items are not established in the record, it is evident that they occurred shortly after Plaintiffs took over the business of the Corporation on September 3, 1974. I therefore find and hold that, for the purpose of interest computations, the said loan and credits should be deemed to have occurred on October 1, 1974.

The statute plainly provides for interest at the rate of six (6%) per cent per year. I find and hold that Plaintiffs may recover interest at six (6%) per cent per year on the following amounts from the dates indicated until the twentieth day following entry of the Order of Judge Hayes dated February 8, 1975:

|  | On: | From: |
|---|---|---|
|  | $10,000.00 | August 18, 1974 |
| | $34,750.00 55,250.00 | September 3, 1974 |
| LESS: | 5,713.34 29,036.66 | October 1, 1974 |

Although interest would normally be six (6%) per cent per annum, the Court's attention is directed to the Order of Judge Robert W. Hayes, dated February 8, 1975, containing the following provisions:

However, in view of statements of counsel for the Hullander Defendants to the effect that the audit may not be completed until the middle of March, counsel for plaintiffs has agreed that the case be not called for trial without the consent of the Hullander Defendants prior to March 13, 1975, provided that the Hullander Defendants agree with Plaintiffs that there shall be added to any judgment upon the First Cause of Action or any counterclaim thereto that may be asserted by said Defendants, interest at the rate of four (4%) per cent per annum over and above any interest otherwise per-

mitted by law, which additional four (4%) per cent interest shall run from the 20th day following the entry of this Order.

It is the opinion of the Court that the foregoing provision embodies an agreement reached by the parties as a basis for the Court's Order granting the Hullander Defendants additional time for completing an audit. It further appears that an appeal was taken from other provisions of said Order, but not from the quoted language. I therefore hold that Plaintiffs are entitled to the statutory rate of six (6%) per cent per annum, plus an additional four (4%) per cent by virtue of the aforesaid agreement, for a total of ten (10%) per cent per annum from the twentieth day following entry of the Court's Order dated February 8, 1975. I further hold that interest at the rate of ten (10%) per cent per annum shall be added to the total sum of Ninety-four Thousand Two Hundred Eighty-six and 66/100 ($94,286.66) Dollars from February 8, 1975 until the date of entry of judgment.

The Statute further provides for the recovery by Plaintiffs of costs and attorney fees. Consideration of these matters is reserved. When they are determined, any award for costs and attorney fees will be added by the Court to the sums found to be due as set forth above and judgment will thereupon be entered accordingly.

AND IT IS SO ORDERED.

As indicated hereinabove, we affirm the order of ■ Judge Coleman of October 16, 1976, with one exception. Buyers submit that the judge erred in failing to find that they are entitled to recover the brokerage commission in the amount of $11,250.00, plus interest, paid to Glen Covey Associates. We agree. This was a "consideration paid for the security" as contemplated by the statute. The entire transaction arose because the sellers listed the security with Covey for sale. The commission paid by the buyers was attributable to the sellers' wrongful conduct. It involved a detriment to the buyers and a benefit to the sellers, and was there-

fore a proper element of the buyers' recovery under the statute. We hold that the sum of $11,250.00 shall be added to the amount awarded by the lower court to the buyers, with interest from September 3, 1974, at the rate heretofore found proper, in keeping with the order of Judge Robert W. Hayes, dated February 8, 1975. In all other respects the order of Judge Coleman, dated October 16, 1976, is affirmed.

## THE APPEAL FROM JUDGE ELTZROTH'S ORDER DATED DECEMBER 29, 1976, AND FROM JUDGE COLEMAN'S ORDER DATED MAY 9, 1977

The trial of the case on its merits, resulting in the order of Judge Coleman dated October 16, 1976, related only to the first cause of action stated in the complaint. All other causes of action stated in the complaint have now been abandoned. The trial did not deal with the issue of the sellers' counterclaim for mismanagement.

After the order of October 16, 1976, Judge Clyde Eltzroth considered: (1) a motion by the sellers for a declaration that the buyers were in default on the counterclaim, because they failed to answer, and for judgment on the counterclaim; (2) a motion by the buyers, requesting that they be permitted to serve a reply or amended reply. Judge Eltzroth denied the sellers' motion and granted the motion of the buyers. This is the second order on appeal.

After the order of Judge Eltzroth, Judge Coleman considered the buyers' demurrer to the counterclaim and sustained it by his order of May 9, 1977. This is the third order on appeal.

The order of Judge Coleman dated May 9, 1977, makes review of the order of Judge Eltzroth somewhat moot. We have, however, considered the appeal from Judge Eltzroth's order and are of the unanimous opinion that no matter of precedent is involved and no error of law appears. We therefore affirm Judge Eltzroth's order under Rule 23 of our Rules of Practice.

As relates to the appeal from Judge Coleman's order sustaining the demurrer, we agree that the counter-claim does not state a cause of action which the sellers are entitled to pursue in this proceeding. If the buyers are liable for mismanagement during the two months they were in control of the corporation, the recovery is an asset of the corporation and not of the stockholders. *Johnson v. Baldwin,* 221 S. C. 141, 69 S. E. (2d) 585 (1952). Judge Coleman recognized that the corporation has the right to pursue the claim in another action, when he said:

I further conclude that if judgment were entered on behalf of defendants on the eighth defense and counterclaim, the corporation would not be barred from bringing a subsequent action since the corporation is not a party to the present action and would not be bound thereby.

The order of Judge Coleman of May 9, 1977 is affirmed.

In summary:

(1) The order of Judge Coleman dated October 16, 1976 is affirmed in part and reversed in part. The case is remanded to the lower court to carry out the directive as indicated hereinabove.

(2) The order of Judge Eltzroth dated December 29, 1976 is affirmed under Rule 23; and

(3) The order of Judge Coleman dated May 9, 1977 is affirmed.

Affirmed in Part; Reversed in Part; and Remanded.