COLEMAN, Justice,
for the Court:
¶ 1. The Securities and Charities Division of the Mississippi Secretary of State Office (the “Division”) brought charges against Marshall Wolfe and Jack Harrington for securities violations pertaining to their operation of SteadiVest, LLC. The Secretary of State found that Wolfe and Harrington had violated Mississippi securities laws, and fines were levied against them. Wolfe and Harrington appealed, and the Chancery Court of the First Judicial District of Hinds County affirmed. Wolfe and Harrington appealed to this Court.

Facts and Procedural History

¶ 2. SteadiVest, LLC, was formed in late 2007. It consisted of a “family” of real estate related companies that purported to offer “a diversified suite of real estate products and services to real estate investors,” including mortgage lending, property management, construction and development, buying and selling real estate, and managing real estate portfolios. Marshall Wolfe' merged and renamed several existing real estate and investment companies to create SteadiVest. Jack Harrington was hired to help consolidate and repackage the existing companies.
¶ 3. In January 2008, Wolfe sent a letter to potential investors regarding the formation of SteadiVest and the opportunity to purchase membership interests in the new company. Wolfe wrote that SteadiVest was “in the process of raising $10 million of growth equity.” Material attached to the letter included a Power Point presentation that provided a vague overview of the company, a private placement memorandum (PPM), the company’s LLC agreement, and a proforma. The material identified the “SteadiVest Management Team,” which included Wolfe as chief executive officer and Harrington as president and chief operating officer, among others. Both Wolfe and Harrington testified that Harrington was the chief financial officer as well. The PPM instructed investors to contact Harrington with questions about the offering.
¶ 4. SteadiVest projected $60,000,000 in revenue and $20,000,000 in earnings over the first five years. The PPM provided that “full and complete records and books of accounts” would be maintained and available to investors at any time upon request. According to the PPM, investment funds would be held in escrow until $1,000,000 was raised or until September 30, 2008, whichever occurred first. In fact, the letter stated: “Importantly, most of the new equity will not be spent at all. It will be kept in the company to give us access to borrowing leverage that will lower the overall cost of capital and allow us to achieve increased profits from our lending products.” In response to the letter to investors, the PPM, and personal solicitations by Wolfe, Harrington, and others, SteadiVest raised approximately $1,585,000 from seventeen investors. However, Wolfe and Harrington never allocated the funds as outlined in the PPM. Escrow accounts were not set up; instead, investors’ money was commingled with other business funds and used to pay bills and support the daily operations of Steadi-Vest.
¶ 5. The Division presented evidence showing that all of the investors’ money was used to prop up SteadiVest or to personally benefit Wolfe and Harrington. For example, between March 19 and 24, 2008, SteadiVest received $495,000 in investments. The money was deposited into SteadiVest’s checking account, and on March 24, 2008, $475,000 was transferred to another of its companies, MTW Investment Financing, LLC. On the same day, MTW used $461,770 to pay off five prior MTW/SteadiVest investors, one of whom *157 was Harrington. Harrington received $306,302 to pay off his promissory notes, which had not yet matured. Harrington also received a salary increase from $100,000 to $150,000. Wolfe used the SteadiVest credit card for personal expenses, including a trip to Disney World, multiple airline tickets, clothing, furniture, almost $5,000 in personal restaurant charges, and more than $22,000 in “miscellaneous personal charges.”
¶ 6. Wolfe filed for Chapter 11 bankruptcy in March 2009. The court converted the bankruptcy to Chapter 7 and added all of the SteadiVest companies. In July 2009, several investors filed suit against Wolfe, Harrington, and other officers in the Circuit Court of Rankin County alleging fraud, negligent misrepresentation, conversion, and conspiracy. The case was removed to the U.S. District Court for the Southern District of Mississippi, then referred to the bankruptcy court.
¶ 7. On November 18, 2009, the Division issued a Summary Cease and Desist Order against SteadiVest. A Summary Cease and Desist Order is also known as a “temporary” or “pending” order or notice. When the Division has reason to believe a person has engaged in conduct prohibited under the Mississippi Securities Act, the Division enters a summary order directing the person to cease and desist illegal activity. See Miss.Code Ann. § 75-71-715 (Rev.2009). The respondent then has thirty days to request a hearing. Miss. Sec. Act R. 803.[1] After the hearing, the hearing officer submits findings of fact and conclusions of law. The Secretary of State reviews the hearing officer’s findings and enters a Final Order. Miss. Sec. Act R. 821.
¶ 8. The Summary Order against Steadi-Vest indicated that the Division began investigating SteadiVest in May 2009 after receiving a consumer complaint about the company. The Division alleged that SteadiVest was a Ponzi scheme and that it had “mislead [sic] and deceived its investors in order to pay off mounting debt and keep its numerous subsidiaries afloat.” The Division accused SteadiVest of “misleading] investors through a PPM [ ... ] which SteadiVest had no intention of fully honoring; through material misstatements of its CEO, Marshall Wolfe; and through material omissions in sales presentations and materials presented to its investors.” A Final Cease and Desist Order against SteadiVest was executed on January 5, 2010.
¶ 9. On January 26, 2010, the Division issued a second Summary Cease and Desist Order and a Notice of Intent to Impose an Administrative Penalty, this time against Wolfe and Harrington, alleging that forward-looking statements in the PPM and personal statements made to investors were misleading and deceptive. The Division said that the numbers used to show potential profit were improbable, were not supported by financials or other evidence, and did not account for the poor economic environment and housing crisis. The Division charged Wolfe and Harrington with five violations:
A. Failure to meet the terms of the PPM because the investment funds were not placed in an escrow account and operating as a fraud in violation of § 75-71-501(2) and (3).
B. Failure to abide by the “Source and Use of Proceeds” section of the PPM.
*158 C. Using investment funds for personal gain.
D. Failure to maintain adequate and required books and records of SteadiVest’s financial operating activities.
E. Misleading and deceptive forward looking statements in the PPM and misleading and deceptive statements to investors regarding the stability of SteadiVest.
Wolfe and Harrington each requested an administrative hearing. The administrative hearing officer approved a motion to bifurcate filed by the Division, which allowed issues A, C, and D to be resolved by formal briefing and issues B and E to be resolved by live testimony and argument.
¶ 10. The hearing officer issued a ruling on September 2, 2010. He determined that there was not enough evidence to reach a conclusion as to Issue C (use of investment funds for personal gain), but he found against Wolfe and Harrington on Issues A and D (failure to place investment funds in an escrow account and failure to maintain adequate books and records). The hearing officer suggested that the Secretary of State impose a penalty of $1,585,000, the amount raised from the offering, with Wolfe paying two-thirds and Harrington paying ' one-third of that amount. Thereafter, Wolfe and Harrington withdrew their request for a live hearing, and the Division agreed to dismiss charges B and E.
¶ 11. On December 1, 2010, the Secretary of State issued a Final Cease and Desist Order against Wolfe and Harrington; Wolfe was fined $850,000, and Harrington was fined $170,000. Wolfe and Harrington appealed to Chancery Court of Hinds County, First Judicial District, and their appeals were consolidated. All parties submitted full briefing to the chancellor, and a hearing was held on January 25, 2012. The chancellor affirmed the Secretary of State’s Final Order. Wolfe and Harrington appealed to this Court.

Standard of Review

¶ 12. ‘When this Court reviews a decision by a chancery or circuit court concerning an agency action, it applies the same standard of review that the lower courts are bound to follow.” Miss. Sierra Club, Inc. v. Miss. Dep’t of Envtl. Quality, 819 So.2d 515, 519 (¶ 15) (Miss.2002). As for the chancellor’s review of factual findings, by statutory mandate, “[t]he findings of the secretary of state as to the facts, if supported by competent material and substantial evidence, aré conclusive.” Miss. Code Ann. § 75-71-601 (Rev.2009) (repealed 2010).[2] However, “statutory interpretation is a question of law that is reviewed de novo.” W.C. Fore v. Miss. Dep’t of Revenue, 90 So.3d 572, 577 (¶ 12) (Miss.2012).
¶ 13. Generally, an administrative agency decision will be reversed only if it “(1) was unsupported by substantial evidence; (2) was arbitrary and capricious; (3) was beyond the power of the administrative agency to make; or (4) violated the complaining party’s statutory or constitutional right.” Id. This Court has said the following about substantial evidence and arbitrary decisions:
Substantial evidence is “something less than a preponderance of the evidence but more than a scintilla or glimmer. The reviewing court is concerned only with the reasonableness of the administrative order, not its correctness.” Miss. Dep’t of Envtl. Quality v. Weems, *159 653 So.2d 266, 280-81 (Miss.1995) (internal citations omitted). An action “is arbitrary or capricious if the agency entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.” Id. at 281 (internal citations omitted). A rebutta-ble presumption exists in favor of agency decisions, and this Court may not substitute its own judgment for that of the agency. Miss. Comm’n on Envtl. Quality v. Chickasaw County Bd. of Supervisors, 621 So.2d 1211, 1216 (Miss.1993).
Sierra Club v. Miss. Envtl. Quality Permit Bd., 943 So.2d 673, 678 (¶ 11) (Miss.2006).

Discussion

¶ 14. Wolfe and Harrington were charged with violating Mississippi Code Section 75-71-501, which provides:
It is unlawful for any person, in connection with the offer, sale[,] or purchase of any security, directly or indirectly,
(1) To employ any device, scheme[,] or artifice to defraud;
(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
(3) To engage in any act, practice^] or course of business which operates or would operate as a fraud or deceit upon any person.
Miss.Code Ann. § 75-71-501 (Rev.2009) (repealed 2010). There exists a dearth of caselaw on Mississippi securities law, however, Mississippi’s regulations are similar to the federal securities regulations, and we are able to look to federal caselaw for guidance.[3] In fact, “[Section] 75-71-501 is virtually identical to § 17(a) of the Securities Act of 1933[.]” Allyn v. Wortman, 725 So.2d 94, 102 (Miss.1998). Section 17(a) is codified at 15 U.S.C. § 77q(a)(l), and it provides:
It shall be unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transportation or communication in in *160 terstate commerce or by use of the mails, directly or indirectly
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
15 U.S.C. § 77q(a)(l) (2006). Rule 10b-5 also contains language nearly identical to Section 75-71-501 and Section 17(a). See 17 C.F.R. § 240.10b-5 (2006):[4]
¶ 15. The hearing officer found, and the Secretary of State and the chancellor both affirmed, that Wolfe and Harrington had violated Mississippi Code Section 75-71-501 because they had failed to comply with the terms of the PPM by not placing investment funds in an escrow account and by not maintaining adequate records of SteadiVest’s financial operating activities. On appeal, Wolfe asserts that (1) the chancellor’s findings were not supported by substantial evidence; (2) the PPM contained sufficient warnings, which rendered the alleged misrepresentations immaterial as a matter of law; and (3) the penalties imposed were not provided for in the statute and were arbitrary, capricious, and unconstitutional. Wolfe also adopts Harrington’s arguments. Harrington asserts that: (1) the hearing officer applied the wrong burden of proof; (2) proof of scien-ter should have been required; (3) Harrington was not responsible for depositing funds into an escrow account, but even if that allegation was true, failure to do so is not a violation of Section 75-71-501; (4) Harrington did not fail to maintain books and records, but even if that allegation was true, failure to do so is not a violation of Section 75-71-501; (5) the hearing officer should have found that Harrington did not use funds for personal gain; (6) Section 75-71-501 is unconstitutionally vague as applied; and (7) the penalty imposed was improper and excessive. The issues have been reorganized for the purpose of discussion.
I. Whether the hearing officer applied the wrong burden of proof.
¶ 16. Harrington asserts that the hearing officer erred in applying the preponderance of the evidence standard, and he claims the burden of proof should have *161 been clear and convincing evidence. The Division rebuts that the Mississippi Securities Act Rules provide that the preponderance of the evidence standard applies. The Division is correct that Rule 817(B) provides that “[ujnless otherwise specified by law, the standard of proof at the hearing shall be by a preponderance of the evidence standard.” Miss. Sec. Act R. 817(B). Harrington claims that Mississippi caselaw has “specified otherwise” by requiring clear and convincing evidence in fraud cases. The dissent agrees with Harrington, doing a solid job of describing the elements and burden of proof applicable to a common law fraud claim sounding in tort. However, both the dissent and Harrington fail to grasp that the instant case is a securities case, brought pursuant to statutory law — not common law — by a state agency to enforce said securities law. Also, the plain language of Section 75-71-501(3) does not contemplate the actual commission of a fraud, but rather “any act, practice[,J or course of business which operates or would operate as a fraud or deceit[.J” (Emphasis added.) Accordingly, there exists no applicable statutory requirement that fraud be proven at all; it is enough to satisfy the statute to show the existence of an act, practice, or course of business that would operate as a deceit.
¶ 17. While common law fraud does require clear and convincing evidence, the United States Supreme Court has held that “the antifraud provisions of the securities laws are not coextensive with common law doctrines of fraud,” and the Supreme Court has upheld the preponderance of the evidence standard in federal antifraud cases. Herman & MacLean v. Huddleston, 459 U.S. 375, 387-89, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); Steadman v. SEC, 450 U.S. 91, 92, 96, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981). As stated above, Section 75-71-501 is virtually identical to Section 17(a) of the federal securities act, and the United States Supreme Court has held that “proof by a preponderance of the evidence suffices to establish liability” in a fraud action brought under Section 17(a). Huddleston, 459 U.S. at 387, 103 S.Ct. 683. See also Steadman, 450 U.S. at 92, 101 S.Ct. 999.
¶ 18. Alternatively, in one Mississippi case in which investors sued an investment solicitor for fraud, the Court held that fraud “must be proven by clear and convincing evidence.” Holland v. Mayfield, 826 So.2d 664, 674 (¶ 45) (Miss.1999) (citations omitted). However, the cases cited for that principle in Holland were not investment securities cases, and the Holland Court did not address the preponderance of the evidence standard or the Mississippi Securities Act Rules. Because the Holland Court failed to address the Mississippi Securities Act Rules, and because Rule 817(B) specifically provides that the preponderance of the evidence standard should be applied, we hold that the Holland Court erred in applying the clear and convincing standard without explaining the departure from the Rules.
¶ 19. To bolster his claim that clear and convincing evidence should be required, Harrington asserts that “this is a quasi-criminal matter where a higher burden of proof should be required,” but he does not provide any support for that position. He also argues that, because of the large fine that could be levied against him, he should be entitled to the same protection given to those subject to punitive damages, which would require a clear and convincing burden of proof. See Miss.Code Ann. § 11 — 1— 65 (Supp.2013). Finally, he asserts the clear and convincing standard is required in other administrative proceedings — such as proceedings for unemployment benefits and lawyer disbarment — but he does not *162 explain why that standard should be applied here, in light of Rule 817.
¶ 20. The Division rebuts that the United States Supreme Court has upheld the preponderance of the evidence standard where similar concerns were at issue. In Steadman, the Court upheld the use of the preponderance of the evidence standard in light of a dissenting opinion that took issue with the standard, arguing that “severe sanctions” had been imposed on Steadman under the antifraud provisions of the securities acts, including being “barred permanently from practicing his profession.” Steadman, 450 U.S. at 104, 101 S.Ct. 999 (Powell, J., dissenting). The Court also affirmed the use of the preponderance standard in civil antifraud proceedings in Huddleston, writing:
[W]e have required proof by clear and convincing evidence where particularly important individual interests or rights are at stake. See, e.g., Santosky v. Kramer, 455 U.S. 745, [756,] 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (proceeding to terminate parental rights); Addington v. Texas, [441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)] (involuntary commitment proceeding); Woodby v. INS, 385 U.S. 276, 285-286, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966) (deportation). By contrast, imposition of even severe civil sanctions that do not implicate such interests has been permitted after proof by a preponderance of the evidence. See, e.g., United States v. Regan, 232 U.S. 37, 48-49, 34 S.Ct. 213, 217, 58 L.Ed. 494 (1914) (proof by a preponderance of the evidence suffices in civil suits involving proof of acts that expose a party to a criminal prosecution).
Huddleston, 459 U.S. at 389-90, 103 S.Ct. 683 (footnote omitted). We hold that the hearing officer was correct in applying the preponderance of the evidence standard based on Mississippi Securities Act Rule 817 and federal case law.
II. Whether proof of scienter should have been required to prove fraud.
¶ 21. Harrington asserts that proof of scienter should have been required. “Scienter” refers to “knowing or intentional misconduct.” Aaron v. SEC, 446 U.S. 680, 696, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). See also Mayfield Motor Co. v. Parker, 222 Miss. 152, 75 So.2d 435, 437 (Miss.1954) (discussing “what amounts to proof of scienter,” the Court held that it must be shown that representations were made “with actual knowledge of their falsity, or without knowing whether they were true or false, or under such circumstances that he ought to have known that they were false, whether he did or not”) (quoting H.D. Sojourner & Co. v. Joseph, 186 Miss. 755, 191 So. 418, 421 (1939)).
¶ 22. As set forth above, Section 17(a) of the federal Securities Act of 1933 is virtually identical to Mississippi’s Section 75-71-501, and the Division points out that the United States Supreme Court has held “that the language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3).” Aaron, 446 U.S. at 697, 100 S.Ct. 1945. The Supreme Court’s discussion on the point was as follows:
The language of § 17(a) strongly suggests that Congress contemplated a scienter requirement under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3). The language of § 17(a)(1), which makes it unlawful “to employ any device, scheme, or artifice to defraud,” plainly evinces an intent on the part of Congress to proscribe only knowing or intentional misconduct. Even if it be assumed that the term “defraud” is ambiguous, given its varied meanings at *163 law and in equity, the terms “device,” “scheme,” and “artifice” all connote knowing or intentional practices. Indeed, the term “device,” which also appears in § 10(b) figured prominently in the Court’s conclusion in Hochfelder that the plain meaning of § 10(b) embraces a scienter requirement. [See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) ].
By contrast, the language of § 17(a)(2), which prohibits any person from obtaining money or property “by means of any untrue statement of a material fact or any omission to state a material fact,” is devoid of any suggestion whatsoever of a scienter requirement. As a well-known commentator has noted, “[t]here is nothing on the face of Clause (2) itself which smacks of scienter or intent to defraud.” 3 L. Loss, Securities Regulation 1442 (2d ed.1961). In fact, this Court in Hochfelder pointed out that the similar language of Rule 10b-5(b) “could be read as proscribing ... any type of material misstatement or omission ... that has the effect of defrauding investors, whether the wrongdoing was intentional or not.” 425 U.S. at 212, 96 S.Ct. 1375[.]
Finally, the language of § 17(a)(3), under which it is unlawful for any person “to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit,” (emphasis added) quite plainly focuses upon the effect of particular conduct on members of the investing public, rather than upon the culpability of the person responsible. This reading follows directly from Capital Gains, which attributed to a similarly worded provision in § 206(2) of the Investment Advisers Act of 1940 a meaning that does not require a “showing [of] deliberate dishonesty as a condition precedent to protecting investors.” [SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 200, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).]
It is our view, in sum, that the language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3). Although the parties have urged the Court to adopt a uniform culpability requirement for the three sub-paragraphs of § 17(a), the language of the section is simply not amenable to such an interpretation. This is not the first time that this Court has had occasion to emphasize the distinctions among the three subparagraphs of § 17(a). In United States v. Naftalin, 441 U.S. 768, 774, 99 S.Ct. 2077, 60 L.Ed.2d 624 [ (1979) ], the Court noted that each sub-paragraph of § 17(a) “proscribes a' distinct category of misconduct. Each succeeding prohibition is meant to cover additional kinds of illegalities — not to narrow the reach of the prior sections.” (Footnote omitted.) Indeed, since Congress drafted § 17(a) in such a manner as to compel the conclusion that scienter is required under one subparagraph but not under the other two, it would take a very clear expression in the legislative history of congressional intent to the contrary to justify the conclusion that the statute does not mean what it so plainly seems to say.
Aaron, 446 U.S. at 696-97, 100 S.Ct. 1945 (footnotes omitted). See also SEC v. Evolution Capital Advisors, LLC, 866 F.Supp.2d 661, 667 (S.D.Tex.2011) (“no scienter is required” under “Sections 17(a)(2) and 17(a)(3) of the Securities Act”). Applying the Supreme Court’s reasoning to the nearly identical Mississippi statute, scienter would be required only for subsection (1) of Section 75-71-501, but it would not be required for subsections (2) *164 and (3).[5] Wolfe and Harrington were charged with violating subsections (2) and (3), so only those subsections are at issue in the instant matter.
¶ 23. Other state courts have adopted the rationale from Aaron v. SEC in regard to similar state laws. See Sec’y of State v. Tretiak, 117 Nev. 299, 22 P.3d 1134, 1141 (Nev.2001) (scienter not required for securities fraud initiated under Nevada Code Sections 90.570(2) and (3), which are almost identical to Sections 17(a)(2) and (3) of the federal code); State v. Shama Res. Ltd. P’ship, 127 Idaho 267, 899 P.2d 977, 982 (1995) (intent or scienter not required to establish fraud under Idaho Code Sections 30-1403(2) and (3), which are virtually identical to Sections 17(a)(2) and (3)); People v. Whitlow, 89 Ill.2d 322, 60 Ill.Dec. 587, 433 N.E.2d 629, 634 (1982) (scienter is an essential element of the offense under the Illinois Code section analogous to Section 17(a)(1), but not an element of the offenses under the sections analogous to Sections 17(a)(2) and (3)); State v. Gunnison, 127 Ariz. 110, 618 P.2d 604, 607 (1980) (“scienter is not an element of a violation of Á.R.S. § 44-1991(2), even though it may be an element of A.R.S. § 44-1991(1),” those sections being virtually identical to Sections 17(a)(1) and (a)(2)).
¶ 24. Sections 17(a)(2) and (a)(3) of the federal Securities Act are identical to Mississippi Code Sections 75-71-501(2) and (3). Those subsections are “devoid of any suggestion” of a scienter requirement, and the focus is on the effect of Wolfe’s and Harrington’s conduct, rather than on their intent. See Aaron, 446 U.S. at 696-97, 100 S.Ct. 1945. Scienter is not a required element for charges brought under Mississippi Code Sections 75-71-501(2) and (3), which are the only sections at issue here. Therefore, the hearing officer and chancellor did not err by not making a specific finding regarding scienter, because they were not required to do so.
III. Whether the PPM contained sufficient warnings, which rendered the alleged misrepresentations immaterial as a matter of law.
 ¶ 25. Wolfe and Harrington assert that the “bespeaks caution” doctrine *165 should be applied because the PPM contained sufficient warnings, which rendered the alleged misrepresentations immaterial. According to the bespeaks caution doctrine, “sufficient cautionary language renders alleged misrepresentations immaterial as a matter of law.” Allyn, 725 So.2d at 103 (¶ 43) (quoting Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 949 F.2d 243, 245-46 (8th Cir.1991)). The Division asserts that the bespeaks caution doctrine applies only to predictions about business results, not to statements of fact. See Calliott v. HFS, Inc., 2000 WL 351753, *6 (N.D.Tex. Mar.31, 2000). The “alleged misrepresentations” at issue are the promises to put investment funds in escrow and to maintain books and records.
¶ 26. Wolfe asks the Court to “read the PPM in its entirety, just as any potential investor should have,” and he claims that it is “replete with warnings, cautions, ALL CAPS, and bold print[,] which stood as alarms for anyone that considered placing their money in this high-risk venture.” Wolfe addresses the main allegations against him and points to two excerpts from the PPM, which he apparently considers to be warnings sufficient to render the allegations immaterial. The cautionary language that Wolfe references has nothing to do with the allegations that he claims are rendered immaterial by those warnings. He pointed to no other language in the PPM pertaining to the promises at issue. The PPM did include numerous warnings about the risks involved, but the promises to hold investor funds in escrow and to maintain records have little to do with the risk of the investment. Those were promises pertaining to business practices with which Wolfe and Harrington failed to comply.
¶ 27. In Rubinstein v. Collins, the Fifth Circuit explained the bespeaks caution doctrine as follows:
... In essence, predictive statements are just what the name implies: predictions. As such, any optimistic projections contained in such statements are necessarily contingent. Thus, the “bespeaks caution” doctrine has developed to address situations in which optimistic projections are coupled with cautionary language — in particular, relevant specific facts or assumptions — affecting the reasonableness of the reliance on and the materiality of those projections. To put it another way, the “bespeaks caution” doctrine merely reflects the unremarkable proposition that statements must be analyzed in context
.... Under our precedent, cautionary language is not necessarily sufficient, in and of itself, to render predictive statements immaterial as a matter of law. Rather, as we have proclaimed, “[m]ate-riality is not judged in the abstract, but in light of the surrounding circumstances.” The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis “is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment.” Inclusion of cautionary language — along with disclosure of any firm-specific adverse facts or assumptions — is, of course, relevant to the materiality inquiry, for such inclusion or disclosure is part of the “total mix of information.” Nevertheless, cautionary language as such is not per se disposi-tive of this inquiry.
Rubinstein v. Collins, 20 F.3d 160, 166-68 (5th Cir.1994) (footnotes omitted). “Predictive” statements include “economic predictions and forecasts.” Id. at 162. Predictive statements are those such as the representations in the PPM that Steadi- *166 Vest projected $60,000,000 in revenue and $20,000,000 in earnings over the first five years. On the other hand, assurances that investments would be held in escrow for a certain period of time and that records would be maintained are not predictive. The bespeaks caution doctrine does not apply to the allegations at issue because they did not involve predictive statements; they were simply promises to perform certain duties.
IV. Whether Harrington’s conduct constituted a violation of Section 75-71-501.
¶ 28. Harrington claims that he did not have a duty to deposit funds in an escrow account or to maintain books and records, but even if he did, failure to do those things did not violate Section 75-71-501. He also claims that there was insufficient evidence to prove that he used investment funds for personal gain. Harrington does not provide support for these arguments, nor does the Division cite any cases in support of its arguments in response. The specific issue of whether violating promises in a PPM constitutes a violation of Section 75-71-501 has not been previously considered by the Court.
A. Failure to deposit funds in an escrow account
¶ 29. The PPM included several statements that “subscription payments [would] be held in escrow” until either $1,000,000 was raised or until September 30, 2008, whichever occurred first. But escrow accounts were never set up, and investors’ funds were deposited in an operating account and used to pay daily operating expenses. Harrington claims that he did not make the promises in the PPM, and he was not responsible for fulfilling them.
¶ 80. Harrington simply claims that he did not handle investor money, and it was not his responsibility to set up an escrow account and make sure investment funds were deposited into it. Harrington says that the comptroller “handled all day-today banking and financial matters for MTW under direction from Wolfe.”[6] Harrington also claims that he had no knowledge that an escrow account was not set up or that the investment funds were being deposited into an operating account. Harrington’s brief did not address the fact that his title was chief financial officer, nor did he explain why, as CFO, he had no knowledge of how the money was handled. The point was addressed at oral argument, and Harrington’s attorney argued that Harrington’s titles did not mean anything, and although he had the title of CFO, Harrington actually had no knowledge of the company’s finances.
¶ 81. Officers of a corporation must exercise utmost good faith and loyalty in discharging their duties. Fought v. Morris, 543 So.2d 167, 171 (Miss.1989); Gibson v. Manuel, 534 So.2d 199, 201 (Miss.1988).[7] If Harrington — as president, *167 CFO, and COO — truly did not know how the investors’ money was being handled, then he violated a fiduciary duty to the investors who purchased membership interests in SteadiVest. He was not acting in good faith when he discussed investment opportunities, as he did not know whether his claims were accurate and whether the company would act responsibly with investors’ money. The Summary Order identified at least eight investors who spoke with Harrington — Mike and Sue Yarbro, Rick Lacey, Hal Parker, Danny Gray, Alex Breeland, Lee Breeland, and Bobby Isonhood. Harrington told them that SteadiVest was doing well and was in good financial condition.
¶ 32. The PPM instructed investors to contact Harrington with any questions or for more information about the offering. And Harrington actually spoke with investors about SteadiVest’s financial condition and the membership offering. Thus, it seems unlikely that Harrington truly knew nothing of the company’s financial state. The hearing officer found that both Wolfe and Harrington exhibited “reckless disregard for the truth,” and he found sufficient evidence to conclude that Harrington had failed to ensure the investors’ money was put into escrow accounts. Harrington’s eonclusory statements, with no supporting facts or evidence, and his claims that he had no knowledge about the status of the escrow accounts are insufficient to contradict the hearing officer’s findings.
¶ 33. Alternatively, Harrington claims that, even if the allegation was true, failure to deposit funds in an escrow account would not be a violation of Section 75-71-501. He claims that the hearing officer faded to identify how the conduct violated 75-71-501, and he claims that the failure was a violation of due process. Section 75-71-501 provides that, with regard to the sale of securities, it is unlawful:
(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
(3) To engage in any act, practice[,] or course of business which operates or would operate as a fraud or deceit upon any person.
Miss.Code Ann. § 75-71-501(2), (3) (Rev. 2009) (repealed 2010). Clearly, the specific act of failing to deposit funds into an escrow account is not explicitly prohibited by Section 75-71-501. However, that section does prohibit making untrue statements and engaging in practices that are or would be fraudulent or deceitful. Id. The assurance that funds would be held in escrow likely would be a “material fact” to investors, as holding the funds in escrow would provide some safety for their investments.
¶ 34. The PPM promised that investment funds would be held in an escrow account. They were not. Instead, investors’ money was deposited into an operating account and used to cover daily expenses. Thus, false statements were made in the PPM, and the use of investors’ money to cover daily expenses was deceitful and fraudulent. We hold that the chancellor did not err in affirming that the conduct was a violation of Section 75-71-501.
*168 B. Failure to maintain books and records
¶ 35. The PPM included a statement that SteadiVest would “maintain full and complete records and books of accounting showing assets, liabilities!,] and the capital accounts of the Members, revenues and expenditures, and all other aspects of the operations, transactions!,] and financial condition of the Company.” Further, it said records were to be kept at the SteadiVest office, and members/investors were to have access to them at any time.
¶ 36. Harrington claims he was not responsible for keeping books and records; he puts that responsibility on the comptroller and on Wolfe, as the CEO. He also claims that the hearing officer failed to specify what books and records Harrington supposedly was responsible for and what records were missing. Finally, he says he could not have provided any records because the request for records was not made until a year after he left the company. Again, Harrington fails to address any responsibility he may have had as president, CFO, and COO.
¶ 37. Harrington goes on to state that, in fact, SteadiVest did provide the Division with “numerous business and financial records,” including several checking account statements, credit card statements, investor subscription documents, loan documents, QuickBooks general ledger accounting entries, and human resources files. That assertion is specious, at best. Printouts of SteadiVest’s credit card statements and checking accounts would not satisfy the promise to maintain books and records showing how investors’ funds were managed (although it is ironic that SteadiVest’s checking account is where the investment funds actually went). The hearing officer found sufficient evidence to conclude that Harrington had failed to maintain books and records, as promised in the PPM. Harrington’s attempt to shift blame and his conclusory statements regarding his lack of responsibility are insufficient to support a finding that the hearing officer erred.
¶ 38. Harrington also claims that, even if the allegation was true, failure to maintain books and records would not be a violation of Section 75-71-501. He claims that, again, the hearing officer failed to identify how the conduct violated Section 75-71-501, and he claims this was a violation of due process. Again, Harrington does not provide any support for his argument. Like the previous issue, the specific act of failing to maintain books and records is not explicitly prohibited by Section 75-71-501, but making untrue statements and engaging in practices that are or would be fraudulent or deceitful is prohibited. Miss.Code Ann. § 75-71-501(2), (3) (Rev.2009) (repealed 2010). The PPM promised that books and records would be maintained and would be available for investors to review at any time. That was not done. As such, the promise was untrue, misleading, and part of the overall fraud committed by Wolfe and Harrington. We find no error in the chancellor’s affirmation that the conduct constituted a violation of Section 75-71-501.
C. Use of investment funds for personal gain
¶ 39. Harrington asserts that the hearing officer should have made a finding that Harrington did not use investment funds for personal gain. Harrington claims that the hearing officer found that there was insufficient evidence to support the claim that he used investment funds for personal gain, but that he failed to make a finding in favor of Harrington. He asks the Court to enter judgment in his favor as to the claim that he used investor funds for personal gain.
*169 ¶ 40. The hearing officer said that the record was “not presently sufficient to make a conclusion of law” on the issue, and any conclusion on the issue would have to await further proceedings. Therefore, the hearing officer did not conclude that Harrington did not use investment funds for personal gain, as Harrington suggests. Rather, he found that the issue could not be determined from the record and that it would have to be determined in a later proceeding. The Division asserts that the issue is not ripe for review because it has not been fully decided. We agree. The hearing officer did not make a finding on the issue, and the chancellor did not review it. “The well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision.” McDonald v. McDonald, 39 So.3d 868, 885 (¶ 54) (Miss.2010) (quoting Mills v. Nichols, 467 So.2d 924, 931 (Miss.1985)). The issue is not properly before the Court.
V. Whether Section 75-71-501 is unconstitutionally vague as applied in the instant case.
¶41. Harrington asserts that Section 75-71-501 is unconstitutionally vague as applied in the instant case and that his due process rights have been violated. He writes that “due process is violated when a statute fails to provide a reasonable person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.” See Hill v. Colorado, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). He asserts that neither the Division nor the hearing officer explained how he violated Section 75-71-501, so his due process rights have been violated. The Division responds that “no special intelligence is required to understand that the statute prohibits lying to promote the sale of securities.” Harrington’s argument on the issue is a restatement of his position that his conduct did not violate Section 75-71-501, which was discussed in the previous section. The issue is without merit.
VI. Whether the chancellor’s findings were supported by substantial evidence.
¶ 42. Wolfe asserts that the hearing officer’s decision and the chancellor’s findings were not supported by substantial evidence; he claims the Division failed to prove reasonable reliance; and he complains that there has been no hearing.
A. Reasonable Reliance
¶ 43. Wolfe claims that “reasonable reliance” was not proven, and he lists eight factors that should be used “to determine whether a plaintiff ‘justifiably relied’ on a defendant’s representations.” See Geisenberger v. John Hancock Distrib., Inc., 774 F.Supp. 1045, 1050-51 (S.D.Miss.1991). Geisenberger dealt with Rule 10b-5 litigation brought by an individual, not by the State. The instant matter is not a private cause of action, so Geisenberger is distinguishable.[8]
*170 ¶ 44. Other state and federal courts have reached the conclusion that the requirements in private causes of action are not the same as in enforcement cases brought by the State. Those courts have held that, along with scienter, reliance is not an element of proving securities violations in enforcement actions. See Geman v. SEC, 334 F.3d 1183, 1191 (10th Cir.2003) (“enforcement action by the Commission is much different from a common law action for damages ... SEC is not required to prove reliance or injury in enforcement actions”); SEC v. Rana Research, Inc., 8 F.3d 1358, 1364 (9th Cir.1993) (“SEC need not prove reliance in its action for injunctive relief on the basis of violations of section 10(b) and Rule 10b-5.”); SEC v. Blavin, 760 F.2d 706, 711 (6th Cir.1985) (“Unlike private litigants seeking damages, the Commission is not required to prove that any investor actually relied on the misrepresentations.... ”); Sec’y of State v. Tretiak, 117 Nev. 299, 22 P.3d 1134, 1141 (Nev.2001) (like scienter, reliance is not a required element of securities fraud in actions initiated under NRS 90.570(2) and (3));[9] Esser Distrib. Co., Inc. v. Steidl, 149 Wis.2d 64, 437 N.W.2d 884, 886-87 (1989) (no reliance requirement in securities fraud action); Bradley v. Hullander, 272 S.C. 6, 249 S.E.2d 486, 494 (1978) (reliance and causation are not necessary elements to prove fraud under South Carolina securities law); State of Idaho, Dep’t of Fin. v. Tenney, 124 Idaho 243, 858 P.2d 782, 788 (App.1993) (detrimental reliance not required in securities enforcement action brought by the state). Based on the cases cited here, we adopt the rule that, along with scienter, reliance is not an element of fraud in securities enforcement actions brought by the State. Thus, the issue is without merit.
B. Formal Hearing
¶ 45. Wolfe takes issue with the fact there has not been a formal hearing. His argument is without merit. Wolfe and Harrington agreed to have three issues resolved by formal briefing and two issues resolved by live testimony and argument at a hearing. After the hearing officer ruled on the three issues that were briefed, Wolfe and Harrington withdrew their requests for a live hearing, and the Division agreed to dismiss the remaining charges. At oral argument, counsel for Wolfe claimed that Wolfe did not withdraw his request for a formal hearing. However, the record includes an agreed order dated November 30, 2010, entitled “Order of Withdrawal and Partial Dismissal,” which was signed by the Secretary of State’s attorney, Wolfe, Harrington, and the administrative hearing officer. The order provided that Wolfe and Harrington withdrew their requests for a hearing, that the scheduled hearing would be cancelled, and that the Division dismissed with prejudice the remaining allegations. A copy of the agreed order was in the record and in the record excerpts submitted by Wolfe and Harrington. Wolfe cannot now complain that he was not given a *171 hearing when he agreed to some of the issues being resolved by briefing and then withdrew his request for a hearing as to the remaining issues so that they would be dropped. “Because of judicial estoppel, a party cannot assume a position at one stage of a proceeding and then take a contrary stand later in the same litigation.” In re Estate of Richardson, 903 So.2d 51, 56 (¶ 17) (Miss.2005) (quoting Dockins v. Allred, 849 So.2d 151, 155 (¶ 7) (Miss.2003)).
¶ 46. Further, the record indicates that the parties submitted briefs to the chancellor, and a hearing was held on January 25, 2012. However, a court reporter was not present at the hearing, thus, there is no transcript for the Court to review. At oral argument, the parties could not explain why they chose to have an “off the record” hearing, but they stated they made the same arguments before the chancellor that they made before this Court. Wolfe’s argument that he did not receive a hearing is disingenuous. He waived his right to a hearing on some of the issues, which were then dismissed, and he did have a hearing in chancery court on appeal. The argument is without merit.
C. Evidence
¶ 47. The only evidence in the record is that provided by the Division. Both Wolfe and Harrington simply deny any wrongdoing and try to lay the blame elsewhere, but they fail to provide any evidence, witnesses, or affidavits to support their positions. The Division asserts that Wolfe and Harrington were both officers of Steadi-Vest during the relevant time period— Wolfe as CEO and Harrington as president, CFO, and COO. Therefore, the Division claims both Wolfe and Harrington “assumed a fiduciary duty to investors to perform the functions of his office with the care that an ordinary prudent person would reasonably be expected to exercise in a like position and under similar circumstances.” See Miss.Code Ann. § 79-4-8.42 (Rev.2013), and Fought v. Morris, 543 So.2d 167, 171 (Miss.1989) (“officers of a corporation stand in a fiduciary relationship to the corporation and its stockholders .... including] exercising the utmost good faith and loyalty in discharge of the corporate office”). The Division claims that Wolfe’s and Harrington’s proclaimed ignorance of how the investors’ money was handled was a breach of their fiduciary duty.
¶48. The Division is correct that we have held that officers of a corporation must exercise utmost good faith and loyalty in discharging their duties. Fought, 543 So.2d at 171; Gibson, 534 So.2d at 201. As discussed above, if Wolfe and Harrington truly did not know how the investors’ money was being handled, then they were not acting in good faith and they violated fiduciary duties to the investors who purchased membership interests in SteadiVest in reliance on statements made and information provided by Wolfe and Harrington. Wolfe signed the January 2008 letter sent to potential investors that outlined the membership offering, and the PPM instructed investors to contact Harrington with any questions or for more information about the offering.
¶ 49. The Summary Order identified at least eight investors who spoke with Wolfe and Harrington — Mike and Sue Yarbro, Rick Lacey, Hal Parker, Danny Gray, Alex Breeland, Lee Breeland, and Bobby Ison-hood. These investors were told that SteadiVest was doing well, was in good financial condition, and would continue to be profitable. It does not seem plausible that Wolfe and Harrington — the individuals acting as the company’s President, CEO, CFO, and COO — honestly did not know about SteadiVest’s financial condition. The hearing officer found that both *172 Wolfe and Harrington exhibited “reckless disregard for the truth.” The hearing officer considered the evidence and determined that Wolfe’s and Harrington’s conduct violated Section 75-71-501.
¶ 50. In an appeal from an administrative agency decision, the agency’s decision must be supported by substantial evidence. Sierra Club, 943 So.2d at 678 (¶ 11). In this context, “[substantial evidence is ‘something less than a preponderance of the evidence but more than a scintilla or glimmer.’ ” Id. (quoting Weems, 653 So.2d at 280-81). There is more than a scintilla of evidence here. “An administrative appeal is not a means to have a court re-weigh evidence and reach a different conclusion.” Sierra Club, 943 So.2d at 677 (¶ 10). We find that the Division presented sufficient evidence, and the chancellor did not err in affirming the Secretary of State’s decision that Wolfe and Harrington committed two violations of Section 75-71-501, because they failed to comply with the terms of the PPM by not placing investment funds in an escrow account and by not maintaining adequate books and records.
VII. Whether the penalties imposed were improper under the statute, arbitrary, capricious, unconstitutional, and/or excessive.
¶ 51. The hearing officer imposed penalties on Wolfe and Harrington under Mississippi Code Section 75-71-715, which allows the imposition of an administrative penalty for violation of Mississippi’s securities regulations. That section provides:
Whenever it appears to the Secretary of State that any person has engaged or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rale or order hereunder, he may, in his discretion, seek any or all of the following remedies:
[[Image here]]
(2)(a) Issue an order in the case of an issuer of registered securities, broker-dealer, investment advisor, agent, investment adviser representative, or other person who violated this chapter, imposing an administrative penalty up to a maximum of Twenty-five Thousand Dollars ($25,000.00) for each offense and each violation shall be considered as a separate offense in a single proceeding or a series of related proceedings; to be paid to the Secretary of State and requiring reimbursement to the Secretary of State for all costs and expenses incurred in the investigation of the violation^) and in the institution of administrative proceedings, if any, as a result thereof;
(b) For the purpose of determining the amount or extent of a sanction, if any, to be imposed under subparagraph (2)(a) of this section, the Secretary of State shall consider, among other factors, the frequency, persistence, and willfulness of the conduct constituting a violation of this chapter or a rule promulgated thereunder or an order of the Secretary of State, the number of persons adversely affected by the conduct, and the resources of the person committing the violation....
Miss.Code Ann. § 75-71-715(2) (Rev.2009) (repealed 2010). According to the above-quoted section, the penalty can be up to $25,000 for each offense, and each violation is considered a separate offense. Id. Further, in determining the amount of a sanction, the Secretary of State “shall consider ... the frequency, persistence, and willfulness of the conduct ... [and] the number of persons adversely affected by the conduct[.]” Id. (emphasis added).
*173 ¶ 52. The Secretary of State found that Wolfe and Harrington had committed two violations against seventeen investors, and he applied the $25,000 maximum for each violation against each investor:
$25,000 x 2 violations = $50,000
$50,000 x 17 investors = $850,000
Wolfe was assessed a penalty of $850,000, the maximum penalty he could have received under the formula. Harrington was assessed a penalty of $170,000. Wolfe argues that the penalties imposed were not provided for in the statute and were arbitrary, capricious, and unconstitutional and therefore violated his due process rights. Likewise, Harrington asserts that the penalties were improper, excessive, and imposed in an arbitrary and capricious manner. Wolfe and Harrington seem to think the fine should be no more than $50,000 ($25,000 for two violations), split between the two of them.
II58. Wolfe and Harrington both assert that the multiplication of the fine by the seventeen investors was improper. Wolfe claims that the Division failed to present testimony from the investors and failed to prove that they had been defrauded. Wolfe argues: “Perhaps these seventeen investors cannot be identified.... Perhaps there were more investors. Or less.” Harrington argues that the “entire process was arbitrary and capricious” because there was no evidence to support multiplying the two violations by seventeen investors. Because the Division did not present evidence about the seventeen investors and there was no testimony from any of them, Harrington says that to conclude “that there were 17 separate violations of the two different offenses is rote speculation.”
¶ 54. The Division did, in fact, identify at least seventeen investors. The Summary Order issued on January 26, 2010, which commenced the action, identified at least eight individuals who claimed to have spoken personally with both Wolfe and Harrington and who ultimately invested in the company. Further, the Division attached numerous exhibits to its brief submitted to the hearing officer, and one exhibit was a capitalization table that identified seventeen investors by name. Several of these investors later filed suit against Wolfe and Harrington, alleging fraud, negligent misrepresentation, conversion, and conspiracy in regard to their investments in SteadiVest. Notably, Wolfe is listed as one of the investors on the capitalization table, which shows that he invested $1,000. The other investments ranged from $15,000 to $284,000. Several of the investors identified in the Summary Order are not included on the capitalization table, so it is possible that there were more than seventeen investors.
¶ 55. Wolfe and Harrington were alleged to have defrauded investors of approximately $1.5 million. After the issues had been briefed and the hearing officer had considered the evidence, the hearing officer made a recommendation to the Secretary of State, suggesting a penalty of $1,585,000, based on the total investment amount. The Secretary of State considered the hearing officer’s recommendation, as well as Section 75-71-715 and the number of violations at issue. The Secretary of State assessed penalties less than the recommended amount, but supposedly based on the method of calculation set forth in Section 75-71-715, of $850,000 to Wolfe and $170,000 to Harrington, for a total of $1,020,000. While we do not find that the manner in which the penalties were assessed rises to the level of being arbitrary or capricious, we do find a lack of evidence regarding the specific number of investors and the violations committed against each.
¶ 56. We affirm the finding that Wolfe and Harrington each committed two viola *174 tions of Section 75-71-501, because they failed to comply with the terms of the PPM by not placing investment funds in an escrow account and by not maintaining adequate records of SteadiVest’s financial operating activities. Because Section 75-71-715 provides that “each violation shall be considered as a separate offense,” we agree that Wolfe and Harrington should each be sanctioned for two separate offenses. However, we do not find a basis in the law for the Secretary of State’s method of calculating the penalties by multiplying the number of violations by the number of investors.
¶ 57. Section 75-71-715 provides that “the number of persons adversely affected by the conduct” shall be considered, but we hold that is a factor to be used-along with frequency, persistence, willfulness, and the violator’s resources-in determining the amount of the sanction' up to $25,000. The number of persons affected is not to be used as a multiplier for each violation. For example, a violation that occurred only once and which affected only two people may warrant a sanction of $5,000, but a violation that occurred multiple times and affected fifteen people may warrant the maximum sanction of $25,000. We have not found support for the Secretary of State’s method of calculating the amount of the penalty by multiplying the $25,000 sanction per violation times the number of persons affected. Further, while the Division did identify investors by name, the exact number of investors is unclear, and it is possible thát there were more than seventeen.
¶ 58. Wolfe and Harrington each committed two violations of Section 75-71-501, and we do not agree with Wolfe and Harrington that the amount of the sanctions should be divided between them. The amount of sanctions against each should be determined by considering the factors set forth in Section 75-71-715 and the number of violations committed. We reverse on the issue of sanctions, and remand the case to the chancery court for calculation and imposition of sanctions against both Wolfe and Harrington under Section 75-71-715, consistent with the instant opinion.

Conclusion

¶ 59. Based on the foregoing, we find that the chancellor did not err in affirming the Secretary of State’s finding that Wolfe and Harrington had violated Mississippi Code Section 75-71-501 because they failed to comply with the terms of the PPM by not placing investment funds in an escrow account and by not maintaining adequate records of SteadiVest’s financial operating activities. The Secretary of State’s decision was supported by substantial evidence, was not arbitrary or capricious, did not go beyond the Secretary of State’s power, and did not violate Wolfe’s or Harrington’s statutory or constitutional rights. See W.C. Fore, 90 So.3d at 577 (¶ 12); Sierra Club, 943 So.2d at 678 (¶ 10). However, we find that the method used to assess penalties against Wolfe and Harrington was improper, and we reverse on that issue. We remand for the chancery court to calculate and assess penalties against Wolfe and Harrington consistent with the instant opinion.
¶ 60. AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
WALLER, C.J., RANDOLPH, P.J., LAMAR, KITCHENS, AND KING, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER AND PIERCE, JJ.

. The Mississippi Securities Act was adopted in 1981; it gave the Secretary of State authority to adopt rules necessary for carrying out the provisions of the Act. Miss.Code Ann. § 75-71-109 (2009) (repealed 2010). The Mississippi Securities Act Rules are available on the Mississippi Secretary of State’s website under the "Securities and Charities” heading.

. The entirety of Title 75, Chapter 71 was repealed and replaced effective January 1, 2010. Because the alleged violations occurred in 2008 and 2009, the new law does not apply, and we consider the law applicable at the time of the alleged violations.

. Where there is a lack of Mississippi caselaw on an issue, the Court often looks to other jurisdictions for guidance. See Lone Star Indus., Inc. v. McGraw, 90 So.3d 564, 571 (¶ 25) (Miss.2012) (looking to federal cases for guidance in construing the Mississippi Rules of Civil Procedure, which were patterned after the Federal Rules of Procedure); Longanecker v. Diamondhead Country Club, 760 So.2d 764, 769-70 (¶ 12) (Miss.2000) (where there was "a dearth of case law or statutory guidance concerning what is required in making a demand on a nonprofit corporation,” the Court considered cases from Tennessee and Georgia applying statutes similar to Mississippi’s law); Hopewell Enter., Inc. v. Trustmark Nat’l Bank, 680 So.2d 812, 817-18 (Miss.1996) (the Court was "compelled to examine case law from other jurisdictions” — both state and federal courts — regarding the relationship between a bank and a borrower because there was a "lack of case law in Mississippi” on the issue); Miss. Ethics Comm'n v. Comm’n on Prof'l Responsibility of the Miss. Bar, 672 So.2d 1222, 1225 (Miss.1996) (Mississippi did not have “a direct case addressing whether confidential material used in litigation by a governmental agency retains its confidential nature,” so the Court looked to the federal courts treatment of such materials used in litigation). See also Miller v. Coast Elec. Power Ass'n, 797 So.2d 314, 317 (¶¶ 10-11) (Miss.Ct.App.2001) (court looked at cases from Maryland and New York pertaining the duty of public utility companies to leave land in a safe condition when their ownership interest in the land ends, because there was a "lack of case law” on the issue).

. The Securities and Exchange Commission promulgated Rule 10b-5 pursuant to Section 10(b) of the Securities Exchange Act of 1934, which provides that is unlawful for any person: "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.” 15 U.S.C. § 78j(b) (2006). Rule 10b-5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.
17 C.F.R. § 240.1 Ob-5 (2006).

. Although not an issue in the instant appeal, we note that the several courts have written that the fact that scienter is not required does not render Sections 75-71-501(2) and (3) strict liability statutes. The courts so writing have noted that the party asserting a violation of those sections is required to prove negligence. See SEC. v. Shanahan, 646 F.3d 536, 541 (8th Cir.2011) ("Violation of § 17(a)(1), § 10(b), and Rule 10b-5 require proof that Shanahan Jr. made misrepresentations or misleading omissions with scienter; violation of § 17(a)(2) and (3) require proof that he acted negligently.”); SEC v. Seghers, 298 Fed. Appx. 319, 327 (5th Cir.2008) ("To show a violation of § 17(a)(1), the Commission must prove (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scien-ter. ... To show that a defendant has violated § 17(a)(2) or § 17(a)(3), the Commission need only show that the defendant acted with negligence.”). Identifying what must be proven under Sections 17(a)(1), (2), and (3), a Texas district court wrote:
To prove violations of the antifraud provisions of the Exchange Act, the SEC must show Defendants: (a) by the use of the mails or an instrumentality of interstate commerce; (b) made false and misleading statements or omissions of material fact or otherwise employed any device, scheme or artifice to defraud or engaged in any transaction, practice or course of business which operates as a fraud or deceit; (c) in connection with the offer, purchase, or sale of securities; and (d) acted with the required intent or scienter. Aaron v. SEC, 446 U.S. 680, 697, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); see 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. The same elements apply under Sections 17(a)(2) and 17(a)(3) of the Securities Act, except that no scienter is required. 15 U.S.C. § 77q(a).
SEC v. Evolution Capital Advisors, LLC, 866 F.Supp.2d 661, 667 (S.D.Tex.2011).

. MTW Investment Financing, LLC, was another company owned by Wolfe. Harrington seems to use SteadiVest and MTW interchangeably.

. The Revised Mississippi Limited Liability Company Act, effective January 1, 2011, addresses limited liability company officers and their standard of conduct. See Miss.Code Ann. §§ 79-29-101 to 79-29-127 (Rev.2013). However, the original Mississippi Limited Liability Company Act, effective prior to 2011 and relevant to the instant case, did not address officers. The Revised Act defines an “officer" as "an individual who is named in or selected or designated pursuant to, the certificate of formation or operating agreement as an officer to manage the limited liability company to the extent and as provided in the certificate of formation or operating agreement.” Miss.Code Ann. § 79-29-105(2) (Rev.2013). The standard of conduct for an officer includes discharging his duties (1) *167 "[i]n good faith and with fair dealing;" (2) ‘‘[w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances;” and (3) "[i]n a manner the officer reasonably believes to be in the best interests of the limited liability company.” Miss.Code Ann. § 79-29-123(6)(b) (Rev. 2013).

. These sections are further distinguished because Section 17(a) applies only to sellers, as it states "[i]t shall be unlawful for any person in the offer or sale of any securities....” Cases brought under Sections 17(a), and the comparable Mississippi Section 75-71-501, are brought by regulators against sellers. Aaron, 446 U.S. at 687, 100 S.Ct. 1945 (citing Section 17(a), 15 U.S.C. § 77q(a)). Section 10(b) and Rule 10b-5 apply to both buyers and sellers, as they state, “[i]t shall be unlawful for any person ... in connection with the purchase or sale of any security...." Aaron, 446 U.S. at 687-88, 100 S.Ct. 1945 (citing Section 10(b) and Rule 10b-5) (emphasis added). Cases brought under Section 10(b) and Rule 10b-5 can be brought by regulators or individuals against buyers or sellers.

. The Nevada Supreme Court has held that its state equivalent to Mississippi Code Section 75-71-501(2) and (3) should not be interpreted consistent with Rule 10b-5:
NRS 90.570(2) and (3) should not be interpreted consistently with Rule 10b-5 because the federal statute deals with private party civil actions, not state enforcement actions. The underlying policy of the Nevada Uniform Securities Act is to prevent unnecessary loss to investors. If the Division were required to wait until an investor relies on "untrue statements] of a material fact” [NRS 90.570(2)] in order to enjoin securities fraud, then the purpose of securities regulations would be frustrated. The Division must be able to enjoin suspected securities fraud before an investor relies on the fraud to his or her detriment.
Tretiak, 22 P.3d at 1140.